918 A.2d 45 (2007)
391 N.J. Super. 291
STATE of New Jersey, Plaintiff-Respondent/Cross-Appellant,
v.
Hector A. VELASQUEZ, Defendant-Appellant/Cross-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued September 12, 2006.
Decided March 21, 2007.
*48 Louis M. Barbone, Atlantic City, argued the cause for appellant/cross-respondent (Jacobs & Barbone, attorneys; Mr. Barbone, on the brief).
Leslie-Ann M. Justus, Deputy Attorney General, argued the cause for respondent/cross-appellant (Anne Milgram, Acting Attorney General, attorney; Ms. Justus, of counsel and on the brief).
Before Judges SKILLMAN, HOLSTON JR. and GRALL.
The opinion of the court was delivered by
GRALL, J.A.D.
Defendant Hector A. Velasquez appeals from a final judgment of conviction and sentence. The State cross appeals and contends that defendant's sentence is illegal.
For reasons stated in Part I of this decision, we conclude that defendant was improperly burdened with an adverse inference based upon his failure to produce a witness. We hold that before authorizing this adverse inference against a defendant in a criminal trial, a court must evaluate the importance of the expected testimony in light of the State's burden of persuasion and any defense asserted. We also hold that unless a defendant in a criminal case has injected an issue such as an alibi or asserted a separate defense, the inference should not be authorized. Finally, we hold that when a court instructs the jury that it may draw the adverse inference, the court must explain its limited significance.
In Part II of this decision, we consider whether a defendant may be sentenced to an extended term for sexual assault or criminal sexual contact, pursuant to N.J.S.A. 2C:44-3g, if the indictment does not allege the facts essential to imposition of that term. We conclude that the indictment must allege the factual predicates.
The grand jurors for Atlantic County returned a nine-count indictment charging defendant with crimes against K.T. and C.M. The grand jurors alleged that the crimes were committed in June 1999, when K.T. was twelve years old, C.M. was fifteen and defendant was twenty-nine. Tried to a jury, defendant was convicted of the following crimes against K.T.: first-degree aggravated sexual assault involving penetration of a child under the age of thirteen, N.J.S.A. 2C:14-2a(1) (count one); sexual assault by sexual contact with a child under the age of thirteen, N.J.S.A. 2C:14-2b (count two); second-degree endangering, N.J.S.A. 2C:24-4a (count three); fourth-degree child abuse, N.J.S.A. 9:6-3 (count four); fourth-degree sexual contact involving physical force or coercion, *49 N.J.S.A. 2C:14-3b and N.J.S.A. 2C:14-2c(1) (count five). In addition, defendant was convicted of the following crimes against C.M.: second-degree sexual assault involving sexual penetration of a child who is at least thirteen but younger than sixteen by a person at least four years older than the child, N.J.S.A. 2C:14-2c(4) (count six); fourth-degree child abuse, N.J.S.A. 9:6-3 (count seven); third-degree endangering, N.J.S.A. 2C:24-4a (count eight), and fourth-degree criminal sexual contact involving physical force or coercion, N.J.S.A. 2C:14-3b and N.J.S.A. 2C:14-2c(1) (count nine). Following his conviction, defendant was evaluated and found ineligible for sentencing as a repetitive and compulsive sex offender pursuant to N.J.S.A. 2C:47-1 to-3.
Defendant's motion for a new trial was denied. The court granted the State's motion for extended terms of incarceration for aggravated sexual assault and sexual assault, pursuant to N.J.S.A. 2C:44-3g, and terms of parole ineligibility and parole supervision in accordance with the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2 (as adopted by L. 1997, c. 117, § 2).
The judge merged defendant's convictions for all crimes against K.T. into his conviction for first-degree aggravated sexual assault and his convictions for all crimes against C.M. into his conviction for second-degree sexual assault. The judge sentenced defendant to an extended term of twenty years for first-degree aggravated sexual assault and a consecutive term of ten years for second-degree sexual assault. Both sentences include NERA terms of parole ineligibility and parole supervision. The judge also imposed a term of community supervision and notified defendant of his obligations to register as a sex offender as required by N.J.S.A. 2C:43-6.4. See N.J.S.A. 2C:7-1 to-11. In addition, the judge assessed appropriate fines, assessments and monetary penalties and required defendant to submit to DNA testing. Defendant filed a notice of appeal in April 2002; the appeal was dismissed on December 2, 2004, and reinstated on April 14, 2005.
Prior to 1997, K.T. lived with her brother and mother, L.E., in New York. L.E.'s mother, her sister, Marta, and Marta's husband lived in the same neighborhood. In late 1996 or early 1997, L.E. moved to Atlantic County to work in a casino. K.T. stayed in New York with her mother's family. In 1997, after L.E. had been away for about one year, K.T. joined her mother in Atlantic County. In October 1997 L.E. gave birth to K.V., who is defendant's child.
L.E. believed in the spiritual world. She talked to K.T. about her beliefs. When they lived in New York, L.E. took K.T. with her when she met with others of the same faith. In 1999 K.T. believed that "saints," who are deceased persons, enter the bodies of living persons who have a "gift." These saints know the future and the problems of the "gifted" ones they inhabit and can help the "gifted" with anything.
In June 1999 K.T. was twelve years old and about to complete the sixth grade. Defendant was twenty-nine and working in a casino in Atlantic City. He lived with L.E. and her family at times and at other times with another woman and their child.
According to K.T., defendant had "sex" with her five times, or fewer, in June 1999. They did "it" on the floor of her mother's bedroom when she was not at home. Defendant put material over K.T.'s eyes. When K.T. cried because "it" hurt, defendant told her to breath in and out. Using slang, K.T. explained what she meant; defendant penetrated her, withdrew, ejaculated on her body and rubbed the "white *50 sticky" discharge, which he said was a "blessing," on her belly. He also touched her breasts. K.T. did "it" because something bad would happen to her or her little sister if she did not.
C.M. is the older sister of one of K.T.'s friends and classmates. According to C.M., defendant had intercourse with her in June 1999, when she was fifteen years old. She went to K.T.'s house because she believed that defendant could do something to prevent her family from sending her back to the Dominican Republic. Defendant was in L.E.'s bedroom. Someone, C.M. could not recall who, gave her something to drink. Defendant told K.T. and K.V. to leave the room, and he closed the door behind them. At defendant's direction, C.M. wrote something in a book. After she did that, defendant took liquid and leaves and put them around her body. He also cut a piece of her hair and put the lock into a white towel. He told C.M. to take her clothes off. When she took off some but not all of her clothing, defendant told her that they "had to finish what [they] had started, and if not, something was going to happen." C.M. did not know whether defendant meant something would happen to her or someone in her family. She removed the rest of her clothing. Defendant disrobed, tied material around her eyes and told her to lie on the floor. He attempted to penetrate her, but she pushed him away. Defendant persisted, penetrated her, withdrew and ejaculated into the towel after rubbing himself.
Defendant warned C.M. that if she told anyone about what they had done something bad would happen. C.M. did not tell K.T. and could not recall whether she told her sister.
On July 12, 1999, K.T. told her mother about "Neto," defendant's dead uncle who lived inside of him. L.E. called the police, and they interviewed K.T.K.T.'s statement, which consisted of questions asked and answers given, was typed. K.T. and L.E. signed K.T.'s statement. The account of defendant's sexual conduct with K.T. that is set forth above is based on that statement. K.T. also gave the police C.M.'s name.
When asked why she told her mother about defendant and Neto on July 12 and not before, K.T. said that she saw defendant that day and he told her that she must see him on July 13. He said that "dead people do bad things" on the thirteenth. He also threatened to show L.E. a paper on which K.T. had written something about a boy she liked.
On the night of July 12, L.E. called her sister Marta. Marta and her husband left New York and drove to L.E.'s home in Atlantic County. They arrived just after midnight. Marta had never seen her sister more upset. She and her husband stayed with L.E. and her children that night.
On the morning of July 13, Marta saw defendant pass in front of L.E.'s home and enter the house through a side window. L.E. was upstairs. Marta's husband told defendant he should not be in the house. In response, defendant declared that K.T. was lying. He said he had three daughters and had not and would not do the things that K.T. said he had done. L.E. did not go downstairs to speak to defendant; she threw his boots to him.
Defendant helped himself to an orange, which he cut and ate in the kitchen. Marta was in the kitchen. Although defendant did not point the knife at her or speak to her, Marta felt threatened. Defendant left.
Later that day, C.M. accompanied the police to L.E.'s home. They recovered a bottle that contained liquid and leaves. According to C.M., the bottle looked like *51 the one defendant used when she was in the room with him.
On that same day, L.E. and Marta took K.T. to the emergency room. An external examination and testing for pregnancy and venereal disease disclosed nothing other than a minor abrasion, which the doctor concluded could have been caused by anything, including K.T.'s clothing. A member of the emergency room staff, who testified at the request of the defense, described L.E. as supportive of her daughter and concerned about the implications of K.T.'s accusation for K.T.'s future and her own.
Ten days later, Dr. Lowen, who examines and treats children who are suspected victims of abuse, examined K.T. Using a Q-tip to permit her to view K.T.'s hymen, rather than a speculum which would permit her to see farther into the child's vagina and cervix, Dr. Lowen observed three well-healed transections. A portion of Dr. Lowen's examination was recorded on camera. The doctor inadvertently turned off the instrument before she observed the transections. As a consequence, images of the transections were not preserved. In the doctor's opinion, the transections were indicative of penetrating vaginal trauma that was caused by either a straddle injury or sexual activity.
Defendant's expert, Dr. Papperman, criticized Dr. Lowen for failing to record the transections. In Dr. Papperman's opinion, the location of the transections reported by Dr. Lowen was not consistent with the sexual activity K.T. had described. Dr. Papperman also found fault with Dr. Lowen's decision to use a Q-tip rather than a speculum to facilitate the internal examination. He contended that it was possible that an examination that permitted observation farther into the child's vagina could have permitted a doctor to rule out intercourse based upon the size of the passage.
Defendant's trial commenced on September 18, 2001. C.M. testified, and her testimony is summarized above. K.T. also testified. She acknowledged that she had said all of the things that were included in the July 12, 1999 statement she gave the police, but she asserted that her statement was a lie. Because of K.T.'s recantation, her July 12 statement was read to the jury.
Evidence concerning the events between K.T.'s initial allegation and her testimony at trial was adduced as relevant to the reasons for K.T.'s recantation. A description of that evidence follows.
After the initial investigation, L.E. took K.T. to New York to live with her sister Marta and Marta's husband. L.E. returned to Atlantic County and her job. K.T.'s aunt and uncle treated her well, talked to her and ate dinner with her  "like a family."
In December 1999 L.E. contacted the office of defendant's attorney. Although L.E. was not a client, the attorney's legal assistant spoke to her as many as ten to fifteen times between December 1999 and September 2001.
By letter dated January 3, 2000, K.T. retracted her accusations against defendant. In that letter, which was addressed "To whom it may concern," K.T. reported that she had lied and defendant had not raped her. She wrote that she did not want her mother to be with defendant and wanted her to be with her father. K.T. and L.E. signed and notarized this letter. According to K.T., L.E. told her to tell the truth but did not tell her what to put in the letter.
Although K.T. was living with Marta and her husband when she wrote the letter, she was afraid to tell Marta that she had *52 lied about defendant sexually assaulting her. K.T. admitted that she later told Marta that her letter of recantation was a lie and that she had written the letter because she was afraid her mother would go to jail.
The defense acquired a diary that K.T. kept between 1997 and a date prior to June 1999. In various entries, K.T. expressed her hatred for defendant, her desire to return to New York, and her disappointment with some of her friends. She described her life in Atlantic County as "ugly" and "terrible" and noted her displeasure at being required to care for her younger sister when there were other things that she wanted to do. At trial K.T. referred to the diary as "proof" of her feelings about defendant.
In June 2001 an investigator from the prosecutor's office visited K.T. at Marta's home. During that meeting, K.T. reaffirmed her statement of July 12, 1999. Later that month, the investigator and the prosecutor went to L.E.'s home to speak to her. K.T. was there. When the investigator showed L.E. the recantation letter, she told her daughter in Spanish, "See, [K.T.], they are going to put me in jail." Speaking Spanish, L.E. also directed her daughter to "follow the letter." K.T. said, "No" and cried. Although the prosecutor's investigator speaks and understands Spanish, he did not use the language that day.
Toward the end of August 2001, K.T. returned to Atlantic County to stay with her mother. On August 30, 2001, in response to the prosecutor's request, L.E. brought K.T. to police headquarters to speak with the prosecutor and investigator. L.E. carried a tape recorder, which she concealed. The legal assistant for defense counsel had given L.E. the recording device, and an investigator for the defense had taught her how to use it. He gave her that instruction at defendant's home while defendant was present.
During the interview on August 30, 2001, K.T. acknowledged some of the facts included in her initial statement but could or would not confirm others. K.T. was asked about her diary; she knew her mother had given her diary to the defense. The tape L.E. made of that interview was played at trial.
When K.T. returned to New York in September, she did not return to Marta's home. She moved in with her maternal grandmother, who lived across the street from Marta. After K.T. moved back to New York, Marta saw her only when L.E. or her mother were present.
As noted above, when K.T. testified at trial she said she had lied and that defendant had not raped her. She offered the following explanations for her contradictory statements: when she implicated defendant, she hated him, wanted to separate him from her mother and wanted to live in New York with her Aunt Marta and her husband; she now wanted to "say sorry that [she] invented all of this"; the "tragedy that's going [on] in New York about the twin towers . . . made [her] realize that [she] should say the truth and not continue with this"; she learned about sex in health class and learned the slang she used to explain what she meant by "sex" from C.M.; she and C.M. "planned the whole thing"; the "plan" was to accuse defendant so that K.T. could go back to New York.
L.E. had testified at a pretrial hearing on the admissibility of the tape recording she made on August 30, 2001, had been subpoenaed by the State to present testimony at trial and was at the courthouse on the day that K.T. testified. Neither the State nor the defense called her as a witness.
*53 On appeal, defendant raises the following issues:
I. THE DEFENDANT, HECTOR VELASQUEZ, RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE COURSE OF THIS TRIAL.
II. THE DEFENDANT, HECTOR VELASQUEZ, WAS DENIED A FAIR OPPORTUNITY TO ENTER INTO PLEA NEGOTIATIONS IN THAT HE DID NOT HAVE A FULL KNOWLEDGE OF THE EVIDENCE THAT THE STATE HELD AGAINST HIM, NOR DID HE HAVE A FULL UNDERSTANDING OF THE POSSIBLE CONSEQUENCES OF A CONVICTION IN THIS CASE.
III. THE DEFENDANT, HECTOR VELASQUEZ, WAS DENIED A FAIR TRIAL AS A RESULT OF THE TRIAL COURT'S PREVIOUS RULING PROHIBITING A DEFENSE MEDICAL EXAMINATION OF THE ALLEGED VICTIM, [K.T.].
IV. IT WAS ERROR FOR THE TRIAL COURT TO INVOKE THE RAPE SHIELD STATUTE, EFFECTIVELY PRECLUDING DEFENSE COUNSEL FROM INQUIRING OF ALLEGED VICTIM [C.M.] WHETHER OR NOT SHE WAS SEXUALLY EXPERIENCED AT THE TIME THESE ALLEGED OFFENSES OCCURRED.
V. THE TRIAL COURT ERRED IN GRANTING THE PROSECUTOR'S REQUEST FOR A CLAWANS CHARGE AS A RESULT OF THE DEFENSE'S FAILURE TO CALL [L.E.] AS A WITNESS.
VI. THE PROSECUTOR'S SUMMATION CONSTITUTED REVERSIBLE ERROR IN THIS CASE IN THAT IT LARGELY CONSISTED OF BAD MOUTHING DEFENSE COUNSEL, THE DEFENSE TEAM, AND THE DEFENSE WITNESSES, AS WELL AS OFFERING THE PROSECUTOR'S PERSONAL OPINION OF THE EVIDENCE.
VII. THE TRIAL COURT ERRED IN SENTENCING HECTOR VELASQUEZ TO AN EXTENDED TERM OF IMPRISONMENT AS WELL AS IMPOSING THE PROVISIONS OF THE NO EARLY RELEASE ACT.
VIII. THE DEFENDANT, HECTOR VELASQUEZ, RECEIVED AN ILLEGAL SENTENCE WHEN THE TRIAL COURT SENTENCED HIM TO TWO SEPARATE EXTENDED TERMS, TO RUN CONSECUTIVELY.
IX. THE TRIAL COURT COMMITTED PLAIN AND PREJUDICIAL ERROR IN FAILING TO SEVER TRIAL ON COUNTS ONE, TWO, THREE, FOUR AND FIVE FROM TRIAL ON COUNTS SIX, SEVEN, EIGHT AND NINE. [(Not Raised Below)]

I.
We begin by addressing defendant's claim that the court misapplied State v. Clawans, 38 N.J. 162, 183 A.2d 77 (1962). Relying upon Clawans and State v. Carter, 91 N.J. 86, 128, 449 A.2d 1280 (1982), the defense counsel and the prosecutor both asked the court to permit them to urge the jurors to draw an adverse inference based on the other's failure to *54 produce L.E.'s testimony. In addition, both asked the court to instruct the jurors that they could infer that L.E.'s testimony would have been unfavorable to the other's case. Determining that L.E.'s testimony would elucidate and potentially add to the evidence about K.T.'s January 2000 recantation and that L.E. had a strong relationship with defendant and was hostile to the State, the trial court granted the prosecutor's requests and denied the requests of defense counsel.
In criminal and civil trials, "failure of a party to produce before a trial tribunal proof which, it appears, would serve to elucidate the facts in issue, raises a natural inference that the party so failing fears exposure of those facts would be unfavorable to him." Clawans, supra, 38 N.J. at 170-71, 183 A.2d 77; see Graves v. United States, 150 U.S. 118, 121, 14 S.Ct. 40, 37 L.Ed. 1021 (1893) (stating that non-production gives rise to a "presumption" that the testimony "would be unfavorable"). The inference is not available whenever a party declines to call a witness who has knowledge of the relevant facts. Wild v. Roman, 91 N.J.Super. 410, 414, 220 A.2d 711 (App.Div.1966). The "inference rests on the assumption that a party will call important witnesses who support that party's version of the events," United States v. Pitts, 918 F.2d 197, 200 (D.C.Cir. 1990), and is proper only when it can be said "with reasonable assurance that it would have been natural for a party to have called the absent witness but for some apprehension about his testimony," Burgess v. United States, 440 F.2d 226, 237 (D.C.Cir.1970). Conversely, when it is more reasonable to infer that the litigant's decision to do without the testimony is explained by factors other than the litigant's fear of its content, the inference is not properly drawn. See Clawans, supra, 38 N.J. at 171, 183 A.2d 77.
Whether a litigant seeks to have the court instruct the jurors on this adverse inference or to urge the inference in closing argument, the trial court has the responsibility to determine if the inference is reasonable under the circumstances of the case. See Carter, supra, 91 N.J. at 128, 449 A.2d 1280. This court and others have stressed the need for trial courts to exercise caution in authorizing the inference. Parentini v. S. Klein Dep't Stores, Inc., 94 N.J.Super. 452, 456, 228 A.2d 725 (App.Div.), certif. denied, 49 N.J. 371, 230 A.2d 402 (1967); see Commonwealth v. Crawford, 417 Mass. 358, 629 N.E.2d 1332, 1336-37 (1994); McCormick on Evidence § 264 at 222 (Broun ed., 6th ed.2006). Caution is of special importance when the State seeks the inference against a defendant in a criminal case. Decisions of federal courts suggest that a rational basis for the inference is required as a matter of constitutional imperative when the inference is invoked against a defendant in a criminal trial. See United States v. Caccia, 122 F.3d 136, 138-140 (2d Cir.1997) (the inference does not diminish the prosecution's burden of persuasion when it rests upon a conclusion that is reasonable from the facts).[1]
*55 Caution is appropriate because of the variety of reasons, unrelated to fear of the content of the testimony, that may more reasonably explain a litigant's decision to refrain from producing a witness. See United States v. Busic, 587 F.2d 577, 586 (3d Cir.1978) (listing reasons for non-production wholly independent of the content of the testimony), rev'd on other grounds, Busic v. United States, 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980). A court should not start with the assumption that an absent witness's testimony must be favorable to either one side or the other and an adverse inference must arise against either. See ibid. In many cases the only rational inference is that the witness's testimony would not have been helpful, which is something quite different than unfavorable or adverse. See ibid. (quoting United States v. Hines, 470 F.2d 225, 230 (3d Cir.1972), cert. denied, 410 U.S. 968, 93 S.Ct. 1452, 35 L.Ed.2d 703 (1973)); Parentini, supra, 94 N.J.Super. at 457, 228 A.2d 725. There is a potential for gamesmanship that rewards the winner by giving unwarranted weight to his or her evidence. See State v. Callahan, 76 N.J.L. 426, 428, 69 A. 957 (Sup.Ct.1908) (discussing import of inference), aff'd, 77 N.J.L. 685, 73 A. 235 (E. & A.1909); McCormick, supra, § 264 at 225 (same).
It is well-settled that a court should evaluate a litigant's decision to do without a witness by considering the "person," who is the witness, and the content of his or her expected "testimony." Parentini, supra, 94 N.J.Super. at 456, 228 A.2d 725. When the person is one who cannot testify, may assert a privilege or is unlikely to give favorable testimony due to bias, the inference is unwarranted because non-production is reasonably explained by inability to secure the testimony rather than fear of its content. See State v. McGraw, 129 N.J. 68, 77-79, 608 A.2d 1335 (1992) (witness who has invoked the privilege against self-incrimination); Carter, supra, 91 N.J. at 127, 449 A.2d 1280 (discussing the inference and the defendant's right against self-incrimination); Clawans, supra, 38 N.J. at 171, 183 A.2d 77 (discussing bias); State v. Hickman, 204 N.J.Super. 409, 414, 499 A.2d 231 (App.Div.1985) (discussing availability), certif. denied, 103 N.J. 495, 511 A.2d 667 (1986). Similarly, when the testimony to be expected from that witness is unimportant to the litigant's case, cumulative or inferior to testimony already presented on the issue, it is more reasonable to infer that non-production is explained by the fact that the testimony is unnecessary. Clawans, supra, 38 N.J. at 171, 183 A.2d 77.
Where the inference is sought against a defendant in a criminal case, the presumption of innocence and the State's obligation to establish each element of the *56 crime charged beyond a reasonable doubt must be considered. See In re Winship, 397 U.S. 358, 362, 90 S.Ct. 1068, 1071, 25 L.Ed.2d 368, 374 (1970); State v. Daniels, 182 N.J. 80, 98, 861 A.2d 808 (2004). We conclude that whenever it is reasonable to infer that the defendant's decision to do without a witness can be explained by the defendant's reliance on the presumption of innocence, the inference is improper. See generally Busic, supra, 587 F.2d at 586 (considering, in a case in which the defendant claimed error because inference against the government was not authorized, that the government's non-production could be explained by the fact that the testimony was unnecessary given the evidence adduced and the burden of proof).
In recent decisions in which our courts have approved the inference against a defendant in a criminal case, the defendant has presented evidence to inject an issue, such as an alibi or an alternate explanation for his or her appearance at the scene of the crime. See State v. Wilson, 128 N.J. 233, 243-45, 607 A.2d 1289 (1992); State v. Irving, 114 N.J. 427, 442-43, 555 A.2d 575 (1989). In such cases, it is reasonable to infer that the defendant would present witnesses who could corroborate his or her self-interested testimony on a point the defense has raised. The same is not as easily said when the defense is a general denial of guilt. Courts should assume that a defendant who has not injected a new issue or defense has elected to rely on the presumption of innocence.
In this case, the trial court erred by failing to consider that although L.E. had a special relationship with defendant and his defense counsel, her testimony simply was not important to defendant's case given the evidence that had been adduced. See Wild, supra, 91 N.J.Super. at 414-16, 220 A.2d 711 (emphasizing the need to consider the propriety of the inference relevant to specific facts to be proved). The trial court concluded that L.E. could shed additional light upon K.T.'s January 2000 recantation, which is no doubt true. The court, however, failed to consider the fact that the State already had presented K.T.'s testimony about that recantation, which was favorable to defendant. K.T., a witness who acknowledged her dislike for defendant, had testified that L.E. did not tell her what to write in her letter of recantation and told her to tell the truth. There was nothing other than circumstantial evidence and K.T.'s candid admission that she had told her aunt that the letter was a lie to contradict her testimony.
Under these circumstances, it was error to permit argument and instruct the jury on the inference. Given the overwhelming evidence of L.E.'s special relationship with the defense and her bias against the State, defendant had little to gain by producing her testimony to corroborate what K.T. had said. At best, reasonable jurors would have assigned little weight to favorable testimony from this witness, who was far from disinterested. From defendant's perspective, L.E.'s testimony was unimportant and cumulative. See Wilson, supra, 128 N.J. at 243-45, 607 A.2d 1289 (assessing the significance of the evidence from the perspective of the defendant); Irving, supra, 114 N.J. at 442-43, 555 A.2d 575 (same).
It is apparent that L.E. was not so likely to favor one side as to warrant an assumption that either defendant or the State did not call her out of concern for the testimony she would give. L.E. was a witness that neither attorney wanted to call because both could expect her testimony to be beneficial in part and harmful in part. The fair inference is that both attorneys hoped to do without her testimony and take advantage of a missing witness instruction. See Burgess, supra, 440 F.2d at *57 239. Courts should not permit a Clawans charge to be used as one might employ a piece in a game of chess.
We must consider whether the error in permitting the adverse inference was "clearly capable of producing an unjust result." R. 2:10-2; State v. R.B., 183 N.J. 308, 330, 873 A.2d 511 (2005). A new trial is not warranted unless there is "`some degree of possibility that [the error] led to an unjust result. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached.'" R.B., supra, 183 N.J. at 330, 873 A.2d 511 (quoting State v. Bankston, 63 N.J. 263, 273, 307 A.2d 65 (1973)) (alterations in original). In order to assess the impact of the error, we must consider the relevant portions of the attorneys' summations and the jury instruction.
Apparently relying on the court's ruling that the inference could be drawn only with respect to the January 2000 recantation, defense counsel urged the jurors to infer that the defense did not call L.E. because her testimony was unnecessary; K.T. had explained that her mother had not told her what to write and told her to tell the truth.
The prosecutor argued for a broader inference. Knowing that the judge would charge the jury on the inference, he asserted:
[L.E.] played a role in every recantation statement. The one in January, what happened before trial started, what happened on this witness stand.
The judge is going to tell you that you can hold it against the defense for not calling [L.E.]. You can hold it against the defense for not calling somebody that they're so associated with, because they fear . . . what she would say. They fear what her testimony would expose. You can hold that against them.
It's very rare, a very rare thing, because the State always has the burden of proof, but in this case the judge will tell you that you can do that.
The prosecutor's argument was improper. Comment on a defendant's failure to produce a witness should not be cast in terms that distort the allocation of the burden of persuasion. See Callahan, supra, 76 N.J.L. at 428, 69 A. 957; 29 Am.Jur.2d Evidence § 247. The unfavorable inference that arises from non-production of a witness "does not relieve the other party from the burden of proving his [or her] case." 29 Am.Jur.2d Evidence § 247; see Callahan, supra, 76 N.J.L. at 428, 69 A. 957. The inference has no effect beyond the weight the jurors assign evidence that has been adduced. Callahan, supra, 76 N.J.L. at 428, 69 A. 957 (an inference "may be considered by the jury in determining the effect to be given to the evidence submitted, but not as proof against him, for the material and necessary facts in support of the state's case must be proved").
We do not know what the prosecutor meant when he told the jurors, three times, that they "could hold it against" defendant for not calling L.E., but the phrase does not invite objective consideration of the evidence implicated in light of the inference. Rather, it suggests that jurors may view defendant as if there were a mark against him because he did not produce the witness. Because this suggestion seriously misstates the law, it is prejudicial. See State v. Lopez, 359 N.J.Super. 222, 233, 819 A.2d 486 (App.Div.) (discussing the prosecutor's misstatement of the law), certif. granted sub nom. State v. Garcia, 177 N.J. 576, 832 A.2d 326, appeal dismissed per stipulation, 178 N.J. 372, 840 A.2d 257 (2003).
*58 The jury charge compounded the problem. See ibid. (discussing the court's failure to correct the prosecutor's misstatement). Read as a whole, the instruction authorized the jurors to infer that L.E.'s testimony would be adverse if they found that she had a relationship with defendant and his defense counsel. Although the court had concluded that the adverse inference was warranted only with respect to the January 2000 recantation, the instruction did not focus the jurors on that factual issue. See Wild, supra, 91 N.J.Super. at 414, 220 A.2d 711 (noting the need for an instruction that identifies the issues upon which the witness could be expected to provide favorable testimony). The court gave the following direction:
Now, during the course of this trial reference has been made to [L.E.] as a person involved in this particular case.
And you also heard that she has not been called as a witness by the defense.
If you find that [L.E.] is a person whom you would naturally expect the defendant to produce to testify, you have a right to infer from the non-production of this witness that her testimony would be adverse to the interest of the defendant.
The basis for this rule is that where a party fails to produce a witness whom probably could elucidate certain facts at issue, it raises a natural inference that the non-producing party fears that the testimony of the witness on that issue would be in some way unfavorable to him.
However, an adverse inference should not be drawn if [L.E.] is not a witness who the defendant would naturally be expected to produce, such as person who, by her position, is likely to be so prejudiced against the defendant that the party could not be expected to obtain the unbiased truth from her.
It should not be drawn if she is equally available to both parties.
Now that's somewhat of a word of art, because whether a witness is equally available is not to be determined from mere physical presence, but you should consider the relationship of the witnesses to the defendant  of the witness to the defendant and other factors related thereto.
And under our case law you can consider, for example, whether the un-called witness is peculiarly within the control or power of only one party or that there is a special relationship between the party and the witness, where the party has superior knowledge of the testimony the witness might be expected to give.
So that's what is meant by equally available or not equally available as the case may be, under the terms of this.
Other things to consider [are] whether her testimony would be comparatively unimportant, cumulative in nature, or inferior to that which you already have before you.
Whether or not an adverse inference should be drawn is for your determination, based on the principles that I have just set forth.
The charge is deficient in several additional respects. It does not provide any guidance on the relevance of defense counsel's alternative explanation for failing to call the absent witness. Although the instruction identifies the cumulative nature of the expected testimony as one factor the jurors might consider, it does not indicate that the law precludes the inference when the testimony expected is cumulative or unimportant. See Clawans, supra, 38 N.J. at 171, 183 A.2d 77.
Taken as a whole, this instruction permitted the jurors to draw a broad adverse inference against defendant on any factual issue L.E. might elucidate solely because *59 she had a special relationship with defendant. Given the overwhelming evidence of L.E.'s relationship with defendant and her involvement in his defense, we must conclude that the jurors drew the broad adverse inference the instruction permitted.
The instruction did not inform the jurors about the limited significance of the inference. When a Clawans charge is given, the jurors should be told that they may not use the inference as affirmative evidence and that the inference simply permits them to assign more or less weight to specific evidence that has been adduced on the point the witness would have elucidated. See Callahan, supra, 76 N.J.L. at 428-29, 69 A. 957 (indicating the various points on which the missing witnesses had personal knowledge). Without that guidance, the jurors may speculate about the testimony that the witness might have given or use the inference as affirmative evidence of consciousness of or actual guilt. Although the relevant model jury charges do not include this essential guidance, see Model Jury Charges (Criminal) Witness  Failure of a Party to Produce (Nov. 18, 1991); Model Jury Charges (Civil) § 1.18 (May 1970), courts should explain the limited significance of the inference.
Finally, the jury instruction did not address the prosecutor's improper argument suggesting that the inference eased the State's burden of persuasion. Although the court gave a general instruction on the burden of proof and directed the jurors that defendant was not obligated to prove his innocence, the court did not explain the relationship between the general instruction and the adverse inference. Nor did the instruction clarify, explain or correct the prosecutor's assertion that the jury could "hold" defendant's failure to call L.E. "against him." The court did not give a general instruction directing the jurors to disregard the attorneys' statements about the law.
Although defendant did not object to the specifics of the jury instruction on the adverse inference or the relevant portion of the prosecutor's argument, these errors are inextricably related to the adverse inference that was erroneously authorized over defendant's objection. For that reason, we have considered the impact of these errors in the aggregate. See Clawans, supra, 38 N.J. at 175, 183 A.2d 77. We are left with reasonable doubt as to whether the errors led the jurors to a verdict they otherwise would not have reached. See R.B., supra, 183 N.J. at 330, 873 A.2d 511.
In reaching the conclusion that the error was not harmless, we have considered the fact there is disturbing evidence that would permit the jurors to find that L.E. had a role in K.T.'s letter of recantation and later pressured the child "to follow [that] letter," either because of, regardless of or despite its truth. From that evidence, the prosecutor argued that K.T.'s initial statement and not the testimony she gave after succumbing to L.E.'s pressure was credible. That argument was permissible. The State, however, did not seek an adverse inference against defendant based upon his authorization of L.E.'s coercion, and the jury was given no direction as to the facts it would be required to find in order to hold L.E.'s conduct against defendant. See State v. Graves, 301 So.2d 864, 867 (La.1974) (discussing circumstances under which evidence of threats or coercion by third parties are admissible against a defendant as evidence of guilt); cf. State v. Rechtschaffer, 70 N.J. 395, 414, 360 A.2d 362 (1976) (recognizing that a defendant's threats to witnesses intending to influence testimony are admissible as inconsistent with innocence); State v. Hill, *60 47 N.J. 490, 500, 221 A.2d 725 (1966) (same).
On this record, we cannot conclude that the erroneous absent witness inference was harmless because an inference of guilt based upon defendant's role in K.T.'s recantation may have been available. That question was not put to the jury.

II.
Although defendant's convictions must be reversed, we consider his claims that he may not be sentenced to extended terms pursuant to N.J.S.A. 2C:44-3g or sentenced in accordance with NERA because the factual predicates were not charged in the indictment, because they will arise on remand if defendant is again found guilty.
Defendant was sentenced to two extended terms pursuant to N.J.S.A. 2C:44-3g. He contends that those sentences were imposed in violation of his right to notice and indictment guaranteed by the State Constitution. N.J. Const. art. I, ¶ 8 ("No person shall be held to answer for a criminal offense, unless on the presentment or indictment of a grand jury. . . ."); State v. Wein, 80 N.J. 491, 497, 404 A.2d 302 (1979) (discussing notice that must be included in an indictment). Defendant's argument is supported by the Supreme Court's decision in State v. Franklin, 184 N.J. 516, 534, 539-40, 878 A.2d 757 (2005), which was issued after defendant was sentenced and applies to cases on direct appeal.
In Franklin, the Court considered an extended term that applies to a repeat offender who "used or possessed a firearm during [the] commission, attempted commission or flight" from the commission of an enumerated crime. Id. at 529, 878 A.2d 757 (quoting N.J.S.A. 2C:43-6(c)); see N.J.S.A. 2C:44-3(d). The defendant had been convicted of manslaughter, which does not require proof that the defendant used or possessed a firearm. Id. at 524, 878 A.2d 757; see N.J.S.A. 2C:11-4(b)(2), (c).
Recognizing that the extended term raises the maximum sentence for second-degree manslaughter to the maximum sentence for a crime of the first degree if the defendant used or possessed a firearm, the Court concluded that the Legislature had, in effect, established a new crime  first-degree "manslaughter while armed." Franklin, supra, 184 N.J. at 530-34, 878 A.2d 757. The Court further concluded the factual predicates for the extended term  possession or use of a firearm  were the "functional equivalent" of essential elements of the new crime. Ibid.
The Court relied upon the "fundamental premise that all elements of an offense `must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.'" Id. at 531, 878 A.2d 757 (quoting Apprendi v. New Jersey, 530 U.S. 466, 476, 120 S.Ct. 2348, 2355, 147 L.Ed.2d 435, 446 (2000)). The Court held that possession or use "of a gun during the commission of a crime is a fact that must be presented to a grand jury and found by a petit jury beyond a reasonable doubt. . . ." Id. at 534, 878 A.2d 757 (concluding that these procedural rights are required by the Sixth and Fourteenth Amendments and N.J. Const. art. I, ¶ 8).
For purposes of the right to indictment, trial by jury and proof beyond a reasonable doubt, the extended term for sex offenders required by N.J.S.A. 2C:44-3g is "a carbon copy of the" extended term considered in Franklin. See id. at 533, 878 A.2d 757 (comparing the extended terms for hate crimes and repeat offenders with a firearm). N.J.S.A. 2C:44-3 requires an extended-term sentence for a conviction of a crime under N.J.S.A. 2C:14-2 or 2C:14-3 if that crime is one *61 "involving violence or the threat of violence and [a] victim . . . [sixteen] years of age or less." N.J.S.A. 2C:44-3g (emphasis added). The terms "involving violence or the threat of violence" are defined as follows:
[A] crime involves violence or the threat of violence if the victim sustains serious bodily injury as defined in subsection b. of [N.J.S.A.] 2C:11-1, or the actor is armed with and uses a deadly weapon or threatens by word or gesture to use a deadly weapon as defined in subsection c. of [N.J.S.A.] 2C:11-1, or threatens to inflict serious bodily injury.
[Ibid.]
Like the possession or use of a firearm, which was required for the extended-term manslaughter at issue in Franklin, the "violence" or "threat of violence" and "age" of the victim, which are required for sex-offender extended terms, are the "functional equivalent" of additional elements that elevate the several offenses included in N.J.S.A. 2C:14-2 and N.J.S.A. 2C:14-3 by one degree.[2]Compare N.J.S.A. 2C:44-3g with N.J.S.A. 2C:43-6c; see N.J.S.A. 2C:43-7. Accordingly, despite the provisions of N.J.S.A. 2C:44-3, which contemplate notice after trial, Franklin compels the conclusion that a defendant may not be sentenced to an extended term pursuant to N.J.S.A. 2C:44-3g unless the indictment alleges that the crime involved "violence" or "threat of violence," as defined therein, and a "victim [sixteen] years of age or less." N.J.S.A. 2C:44-3g. Because "violence" or "threat of violence" and "age" are the functional equivalent of elements of the extended-term crime, the facts must be alleged and proven in the same manner as any other element of a crime. Franklin, supra, 184 N.J. at 534, 878 A.2d 757.
The crimes for which defendant received extended-term sentences do not include the elements of "violence" or "threat of violence," as defined in N.J.S.A. 2C:44-3g. His crime against K.T. was established by proof that he sexually penetrated a child under the age of thirteen, N.J.S.A. 2C:14-2a(1). His crime against C.M. was established by proof that he sexually penetrated a child who is at least thirteen but younger than sixteen and that he was at least four years older than that child, N.J.S.A. 2C:14-2c(4).
In contrast to the violence element required for the extended term, the "age" element of the sex-offender extended term, a victim sixteen years of age or less, is included in the sexual assaults for which defendant was indicted. N.J.S.A. 2C:14-2a(1), c(4). Quite obviously, the fact that one child was thirteen or younger and that the other was younger than sixteen suffices to establish the "age" required for the extended term, which is sixteen years of age or younger. N.J.S.A. 2C:44-3g.
While the question whether defendant's crimes involved "violence" or "threat of violence" was submitted to the petit jury in this case, those facts were not presented to the grand jury.[3] Accordingly, Franklin, which requires presentation of the factual issue to both the grand jurors and the petit jurors, precludes imposition of the *62 extended term for either crime. 184 N.J. at 534, 878 A.2d 757; see N.J.S.A. 2C:1-8b. In this case, defendant had no prior notice that he was exposed to extended terms and would be required to defend against the allegation that the crimes involved "violence" or "threat of violence." Cf. Wein, supra, 80 N.J. at 497, 404 A.2d 302. The prosecutor did not raise the issue until the defense had rested.
The State argues that because "physical force or coercion" is an element of crimes charged in separate counts of the indictment, defendant had adequate notice. That argument ignores the meaning of the terms upon which the State relies. Neither "physical force" nor "coercion" require proof of conduct that meets the "violence" element of the sex-offender extended term.
"Physical force," for purposes of N.J.S.A. 2C:14-2, does not require proof of force in addition to that necessary for penetration so long as the penetration was accomplished "in the absence of what a reasonable person would believe to be affirmative and freely-given permission. . . ." State in the Interest of M.T.S., 129 N.J. 422, 444, 609 A.2d 1266 (1992). "Coercion" is statutorily defined to include specified acts that amount to criminal coercion. N.J.S.A. 2C:14-1j; N.J.S.A. 2C:13-5a(1)-(4), (6)-(7). Pertinent here, coercion requires proof of threats to "[i]nflict bodily injury" or "substantially harm another person with respect to his health. . . ." N.J.S.A. 2C:13-5a(1), (7). In contrast, N.J.S.A. 2C:44-3g requires proof of a more serious injury or threat  infliction of a "serious bodily injury," N.J.S.A. 2C:11-1b, or use of or threat to use a "deadly weapon," N.J.S.A. 2C:11-1c, or threat to inflict "serious bodily injury." Because the elements of physical force and coercion do not include the conduct or injury necessary to establish the element of "violence" required for the extended term, the fact that the indictment refers to physical force or coercion is irrelevant.
In addition to challenging the extended terms, defendant contends that he may not be sentenced in accordance with the provision of NERA in effect on the date of defendant's crimes because the indictment did not allege that he "use[d], or threaten[ed] the immediate use of, physical force" that was required for imposition of a NERA sentence on the date that his crimes were committed. A NERA sentence does not alter the maximum term for a crime; it requires a period of parole ineligibility. In State v. Abdullah, 184 N.J. 497, 511-12, 878 A.2d 746 (2005), the Court concluded that the factual predicates for imposition of periods of parole ineligibility, which do not increase the maximum punishment for the crime, are not the functional equivalents of elements of a crime. In State v. Johnson, 166 N.J. 523, 766 A.2d 1126 (2001), the Supreme Court left open the question whether the factual predicates for NERA sentencing under the provisions of N.J.S.A. 2C:43-7.2 (as adopted by L. 1997, c. 117, § 2) must be charged in the indictment. Based upon the Court's subsequent holding in Abdullah, we conclude that the factual predicates for a NERA sentence need not be presented to the grand jury.[4]See Franklin, supra, 184 N.J. at 534 n. 6, 878 A.2d 757 (distinguishing periods of parole ineligibility and extended terms and *63 approving State v. Figueroa, 358 N.J.Super. 317, 318, 325, 817 A.2d 982 (App.Div. 2003), which authorizes judicial factfinding for periods of parole ineligibility).
To summarize, we hold that defendant may not be sentenced to an extended term pursuant to N.J.S.A. 2C:44-3g because the indictment did not allege the factual predicates. We reject his claim that the court erred in imposing NERA sentences because the factual predicates were not alleged in the indictment.

III.
Our resolution of the issues addressed in Parts I and II of this decision makes it unnecessary to consider either the arguments raised in Points I, II, III, VI and VIII of defendant's brief or the State's claim that defendant's extended-term sentence for aggravated sexual assault is illegal because it is below the minimum term authorized by N.J.S.A. 2C:43-7a(1).
Defendant did not request a severance of charges below. For that reason, we decline to consider the issue raised in Point IX, which defendant may raise on remand. See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973).
Because the issue raised in Point IV of defendant's brief may arise on retrial, we have considered his claim that the trial court erred in denying his application to cross-examine C.M. about her sexual conduct with others. The argument lacks sufficient merit to warrant more than brief comment. R. 2:11-3(e)(2). In this case there was no evidence of pregnancy, semen or disease, and consent was not at issue due to C.M.'s age. For that reason, none of the exceptions to the "rape-shield" law incorporated in N.J.S.A. 2C:14-7 applied. Further, the court properly balanced the interests identified as relevant to the scope of cross-examination of a rape victim in State v. Budis, 125 N.J. 519, 533-34, 593 A.2d 784 (1991). C.M. was seventeen years old and expecting a child at the time of trial. She was fifteen years old at the time of the alleged sexual assault. Neither C.M.'s description of the sexual conduct nor the slang K.T. claimed to have learned from C.M. revealed knowledge of sexuality beyond that to be expected of a child of C.M.'s age who had not been the victim of a sexual assault. See ibid.
Reversed and remanded for a new trial.
NOTES
[1] On a variety of grounds  diminished need for the inference in light of modern discovery practices and evidence rules that permit a party to impeach his or her own witness; the multitude of reasons for declining to call a witness; the potential to give undeserved significance to the missing witness and unwarranted weight to evidence presented; potential for abuse and gamesmanship, and the complexity of the questions  scholars have questioned the continued validity and utility of the inference. See McCormick, supra, § 264 at 222-23; Robert H. Stier, Jr., Revisiting the Missing Witness Inference  Quieting the Loud Voice from the Empty Chair, 44 Md. L.Rev. 137 (1985). For similar reasons, the courts of several states have limited the use of missing witness instructions in criminal trials. See, e.g., State v. Malave, 250 Conn. 722, 737 A.2d 442 (1999) (abandoning the charge in criminal cases for reasons of policy but continuing to permit argument by counsel, and citing decisions in accord), cert. denied, 528 U.S. 1170, 120 S.Ct. 1195, 145 L.Ed.2d 1099 (2000); State v. Brewer, 505 A.2d 774, 777 (Me.1985) (holding that "in a criminal case the failure of a party to call a witness does not permit the opposing party to argue, or the factfinder to draw, any inference as to whether the witness's testimony would be favorable or unfavorable to either party"); State v. Tahair, 172 Vt. 101, 772 A.2d 1079, 1080 (2001) (concluding that the "`missing witness' instruction has outlived its usefulness in criminal trials, and should be abandoned"); Russell v. Commonwealth, 216 Va. 833, 223 S.E.2d 877, 879 (1976) (noting that an instruction against a defendant in a criminal case tends "to weaken, if not neutralize, the presumption of innocence"); State v. James, 211 W.Va. 132, 563 S.E.2d 797, 800-02 (2002) (noting that the charge given did not permit a permissive inference against the defendant and indicating that the Court would be inclined to follow Russell, supra, if a charge permitting the inference had been given).
[2] N.J.S.A. 2C:14-2 and N.J.S.A. 2C:14-3 both define several separate sex offenses that vary in degree. In some instances the sexual conduct is criminalized solely on the basis of the age of the victim or the age of the victim and the age of the defendant. See, e.g., N.J.S.A. 2C:14-2a(1) and (2), b, c(4). In other instances the sexual conduct is criminalized on the basis of specified additional acts committed or injury inflicted in connection with the sexual offense. See, e.g., N.J.S.A. 2C:14-2a(3), (4), (5), (6).
[3] Defendant does not argue that the evidence was inadequate to support the findings.
[4] This holding has limited significance. Effective June 29, 2001, the Legislature amended N.J.S.A. 2C:43-7.2. See L. 2001, c. 129, § 1. Under current law, the crimes subject to NERA sentences are enumerated, and there is no factual predicate beyond the elements of the crimes listed. See N.J.S.A. 2C:43-7.2. Because the conduct in this case allegedly occurred in July 1999, the pre-amendment law applies.