**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5327-16T3

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

CARLOS W. CARDOZA,

     Defendant-Appellant.

_____

> Submitted November 12, 2019 – Decided February 12, 2020
>
> Before Judges Ostrer, Vernoia and Susswein.
>
> On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 15-06-0464.
>
> Joseph E. Krakora, Public Defender, attorney for appellant (Louis H. Miron, Designated Counsel, on the brief).
>
> Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney for respondent (Milton S. Liebowitz, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant, Carlos Cardoza, appeals from his trial convictions for first-degree robbery, possession of a weapon for an unlawful purpose, and unlawful possession of a weapon. Defendant also challenges the ten-year sentence he received.

Defendant raises a number of contentions on appeal, including that (1) he was denied the right to present evidence of third-party guilt; (2) the State engaged in spoliation of evidence; (3) the trial court improperly denied defendant's request for a Clawans[1] charge and his request for a jury instruction concerning a purported "showup" identification; and (4) the trial judge erred when delivering the witness identification charge to the jury. We have reviewed the record in light of the applicable legal principles and conclude there is no basis either to overturn the jury verdict or the sentence. With one minor exception, no errors were committed at trial, much less the cumulative errors defendant asserts. The one exception—the trial court's reference in its identification jury charge to "the" weapon rather than "a" weapon—does not rise to the level of plain error. That isolated misstatement, made in the course of

---

[1] State v. Clawans, 38 N.J. 162 (1962). A Clawans charge permits a jury to draw an adverse inference against an opposing party when the party's failure to present evidence "raises a natural inference that the party so failing fears exposure of those facts would be unfavorable to him [or her]." Id. at 170 (citing 2 Wigmore on Evidence § 285 (3d ed. 1940)).

A-5327-16T3

delivering lengthy and accurate jury instructions, was not capable of producing an unjust result.  R. 2:10-2.

I.

Defendant was indicted on six counts, including two separate robbery charges and related weapons offenses.  The charges stemmed from two incidents on separate dates at a gas station-convenience market.  During the first incident, which occurred February 3, 2015, the robber made off with between $200 to $240.  The second incident occurred two nights later when the victim believed the robber returned, but the victim was able to lock himself inside the attendant's booth, preventing the suspect from entering.

Defendant was tried before a jury and convicted of the three counts relating to the February 3, 2015 incident, i.e., first-degree robbery, fourth-degree unlawful possession of a weapon, and third-degree possession of a weapon for an unlawful purpose.  The jury acquitted defendant of the robbery and related charges associated with the second incident.  The judge merged the weapons convictions into the robbery conviction and sentenced defendant to ten years imprisonment, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

A-5327-16T3

## II.

### A. Incident on February 3, 2015

On the night of February 3, 2015, the victim, Oscar Perdomo, was working as an attendant at a gas station-convenience market in Elizabeth. At around 8:00 p.m., Perdomo went into the attendant's booth to eat a sandwich when he saw someone approach the booth. Although the person partially concealed his face with a scarf, Perdomo could see his eyes and part of his nose. Perdomo believed the individual was white or Hispanic. Perdomo also noticed the person was "a little bit taller" than he is, meaning a little taller than five feet, six inches. Evidence showed defendant was five feet, seven inches tall. The approaching person was wearing a blue jacket with white stripes on the chest.

The suspect entered the booth, pushed Perdomo up against the cash register, and held a knife against him. The knife had a black handle and was between nine and eleven inches long. Speaking in Spanish, the robber told Perdomo to "give him the money." Perdomo complied with the demand and gave the assailant between $200 and $240.

Perdomo watched as the robber walked away slowly. Perdomo promptly called the police, but the robber left the area before they arrived.

4

## B. Incident on February 5, 2015

Two days later, around 8:00 p.m., Perdomo saw "the same man" at the gas station wearing "a different shirt." He recognized him as the person who robbed him two nights before in part by "the way he walked," referring to his slow pace. Perdomo instructed the store clerk, Adrianna Senabria, to call 9-1-1 as Perdomo retreated into the bathroom in the attendant's booth, locking the door behind him. The suspect attempted to enter the booth, pulling on the locked door. When the booth door did not open, the suspect walked away towards Elizabeth Avenue.

Perdomo resumed pumping gas but kept a watchful eye on the suspect in the distance. Elizabeth Police Officers Benenati and Haverty were dispatched to the gas station in response to Senabria's 9-1-1 call. The dispatch radio communication described the suspect as a "black male." When the officers arrived, Perdomo ran from the attendant booth to the police car, pointed to a man "lurking" in the shadows, and exclaimed, "that's him." The officers drew their service weapons and ordered the person Perdomo pointed to, defendant, to raise his hands and not move.

As he approached the suspect, Officer Benenati observed a black handle with silver rivets protruding from defendant's front right pocket. The officer

removed the object, which was a kitchen knife. When Benenati took the weapon to the police car to secure it, Perdomo saw it and told Benenati it was the knife that had been used in the robbery two days earlier. The officers arrested defendant and secured his clothing, including a scarf and a blue winter jacket with reflective stripes on the front and back.

### III.

Defendant presents the following contentions on appeal:

POINT I

THE TRIAL COURT ABUSED ITS DISCRETION IN NOT PERMITTING [DEFENDANT] TO ARGUE HIS THIRD-PARTY GUILT DEFENSE.

POINT II

THE TRIAL COURT ABUSED ITS DISCRETION IN NOT PERMITTING [DEFENDANT] TO ARGUE THAT THE STATE ENGAGED IN SPOLIATION WITH RESPECT TO THE 9-1-1 TAPE AND IN FAILING TO INSTRUCT THE JURY WITH A CLAWANS CHARGE.

POINT III

[DEFENDANT'S] MOTION FOR A MISTRIAL SHOULD HAVE BEEN GRANTED BECAUSE THE STATE DID NOT PRODUCE THE DISCOVERY CONCERNING THE 9-1-1 RECORDING IN A TIMELY MANNER AND IT WAS NOT UNTIL AFTER THE TRIAL HAD BEGUN THAT IT WAS

LEARNED THAT THE 9-1-1 CALLER DESCRIBED THE SUSPECT AS A "BLACK MALE."

POINT IV

THE TRIAL COURT ABUSED ITS DISCRETION IN RULING THAT THE ALLEGED VICTIM'S IDENTIFICATION OF DEFENDANT WAS NOT A SHOWUP IDENTIFICATION AND THUS, THE TESTIMONY OF THE ALLEGED VICTIM AND THE POLICE OFFICER CONCERNING THE IDENTIFICATION AT THE GAS STATION SHOULD BE EXCLUDED AT TRIAL.

POINT V

DEFENDANT IS ENTITLED TO A NEW TRIAL BECAUSE THE COURT'S INSTRUCTION ON IDENTIFICATION WAS FATALLY FLAWED AS IT WAS NOT TAILORED TO INCLUDE THE MODEL CHARGE CONCERNING THE CRITICAL FACT THAT THE EYEWITNESS' IDENTIFICATION WAS MADE AT A [SHOWUP].

POINT VI

[DEFENDANT] IS ENTITLED TO A NEW TRIAL BECAUSE THE COURT'S INSTRUCTION ON IDENTIFICATION WAS MATERIALLY FLAWED AS IT IMPROPERLY SUGGESTED THAT A WEAPON WAS NECESSARILY INVOLVED IN THE ALLEGED OFFENSES.

POINT VII

[DEFENDANT'S] CONVICTION SHOULD BE VACATED AND THIS COURT SHOULD ORDER A NEW TRIAL BASED UPON THE CUMULATIVE

A-5327-16T3

EFFECT OF THE TRIAL COURT'S ERRORS THROUGHOUT [DEFENDANT'S] TRIAL.

POINT VIII

THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO DOWNGRADE DEFENDANT'S SENTENCE TO A SENTENCE FOR A SECOND DEGREE [sic] OFFENSE BASED UPON THE RECORD AND, THEREFORE, DEFENDANT'S SENTENCE SHOULD BE VACATED.

IV.

We first address defendant's contention that the trial court erred in preventing defendant from presenting evidence of third-party guilt. The central issue at trial was whether defendant was the person who committed the robbery. It bears noting at the outset that the State at trial presented surveillance video that captured the first robbery.[2]

Defendant sought to introduce an audio recording of the police dispatch radio transmission on February 5, the second incident, that described the suspect as a black male. The trial court ruled this evidence was inadmissible, holding that the description of the suspect was "double hearsay" and unreliable, in part

---

[2] The surveillance video of the alleged second robbery two days later did not clearly show the perpetrator and therefore was not admitted at trial.

because it could mislead the jury. Based on our review of the record, we conclude the audio recording and related testimony was properly excluded.

We begin our analysis of the admissibility of the police dispatch recording by acknowledging the legal principles that apply. It is axiomatic that courts must provide criminal defendants "a meaningful opportunity to present a complete defense." California v. Trombetta, 467 U.S. 479, 485 (1984). This includes, of course, a defendant's right to introduce evidence of third-party guilt. See State v. Fortin, 178 N.J. 540, 591 (2004) (discussing third-party guilt and the applicable requirements and standards). A defendant does not have to prove his or her innocence when introducing evidence of third-party guilt, nor does the defendant need to show the evidence supports a probability that another person committed the crime. Ibid. Rather, evidence of third-party guilt "need only be capable of raising a reasonable doubt of defendant's guilt." Ibid. (quoting State v. Koedatich, 112 N.J. 225, 299 (1988)).

It is not enough, however, for a defendant to introduce "some hostile event and leave its connection with the case to mere conjecture." State v. Sturdivant, 31 N.J. 165, 179 (1959) (discussing circumstances when a defendant on trial for murder can "seek to prove that another agency produced the death with which he is charged"); see also Koedatich, 112 N.J. at 301 (explaining third-party

9

evidence is properly excluded when the proffer only proves the hostile event and leaves the connection to conjecture). Rather, there needs to be a "link between the evidence and the victim or the crime." Koedatich, 112 N.J. at 301.

Furthermore, evidence supporting third-party guilt must satisfy the New Jersey Rules of Evidence. Fortin, 178 N.J. at 591. In reviewing a trial court's evidentiary rulings, we apply the abuse of discretion standard. State v. Kuropchak, 221 N.J. 368, 385 (2015) (citing Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008)).

Turning to the trial court's decision to exclude the dispatch audio recording, we begin by putting the "black male" description in context by recounting the circumstances in which defendant was apprehended. The description of the suspect as a black male was not given on the day of the first robbery incident. Rather, it was generated on February 5, when the suspect returned to the gas station two days later. This description was communicated to police in the radio transmission that dispatched a police vehicle to the gas station/convenience market in response to Senabria's 9-1-1 call.

Immediately upon their arrival at the gas station, the responding officers encountered the robbery victim, who had been continuously watching the person he believed had committed the first robbery. The victim immediately pointed

out the suspect to the officers, making it unnecessary for them to canvass the area to determine if anyone matched the general description that been given in the dispatch transmission. Defendant's apprehension, therefore, was not based on the description in the radio communication, but rather in direct response to the information provided to the officers by the victim immediately upon their arrival. Furthermore, the victim at no time provided the officers with a verbal description of the suspect, but rather directed their attention to a specific individual by pointing at him.

We next turn to the events that transpired in the courtroom. In his opening statement to the jury, defense counsel referred to a black male, suggesting the February 3 robbery had been committed by that person, not defendant. During cross-examination of Officer Benenati, defense counsel asked if the officer recalled that the police dispatcher described the suspect as a black male. Benenati testified he did not recall that description.

Following the State's objection to this line of questioning, the jury was excused. The audio recording of the radio transmission was played for Benenati outside the presence of the jury. Even after hearing the recording, Benenati did not recall hearing the description of the suspect, although he did not dispute that he might have heard it. The trial court explained to Benenati that the jury was

11

going to return and that defense counsel was going to ask him once again about the description of the suspect in the dispatch radio transmission. The judge instructed Benenati to answer the question based on what he knew before hearing the audio recording in court.

The judge also ruled that unless the description in the recording was "authenticated to a greater degree" the jury would not hear it. Regarding defendant's theory of third-party guilt based on the description of the suspect as a black male, the judge stated:

> I think that asking the question, it is certainly [a] good faith question at this point. There's support for it in the record. But in terms of getting that piece of information before the jury through admissible evidence, you're going to have to call either [Senabria] or the 911 dispatcher.

The court later convened a hearing pursuant to N.J.R.E. 104. The court heard testimony outside the presence of the jury from the 9-1-1 operator who took the February 5 call from Senabria in Spanish. After listening to a recording of the 9-1-1 call, the operator verified that Senabria had not given any description of the suspect.[3]

---

[3] The audio recording of the 9-1-1 call was uncharacteristically "choppy." As we discuss in Section V, there is no evidence before us that reasonably suggests

The police dispatcher also testified at the N.J.R.E. 104 hearing. She acknowledged she said the suspect was a black male in her radio transmission, but she could only "guess" as to where that information came from because that the description was not in the Computer-Aided Dispatch (CAD) system.[4] She acknowledged she may have conflated information from another case.

After hearing these witnesses, the trial court precluded defendant from pursuing the "black male" third-party-guilt defense theory.[5] The judge in his oral opinion first noted defense counsel had not given notice of a third-party guilt defense. See State v. Cotto, 182 N.J. 316, 334 (2005) (requiring a

---

that Senabria gave a description of the suspect that was deleted from the audio recording.

[4] We recognize that information entered into the CAD system can be deleted. However, no evidence was presented that suggests that happened in this case.

[5] Defendant's appellate brief alludes to yet another third-party-guilt argument, this time implicating police officers. The brief notes that defendant's trial counsel "had also intended to argue that the police officers planted the knife on Cardoza at the time of the arrest." It is not clear from this isolated statement in the brief whether defendant means to argue before us that the trial court erred by precluding counsel from pursuing that allegation against the arresting officers. If so, the record clearly shows the judge did not limit counsel from pursuing that defense theory. Although the court ruled that counsel could not argue that a black male committed the robbery, the court also stated, "the defendant will certainly be free to argue if he wants that the knife was planted." Apparently, counsel on his own elected not to pursue the theory that the officers lied about finding the knife in defendant's pocket.

13

defendant to notify the State if he or she plans to cast blame on a specific third party so the state can investigate the claim (citing State v. Loftin, 146 N.J. 295, 345–46 (1996))). Nor did counsel cross-examine the victim, Perdomo, on whether the robber might have been a black male rather than a white or Hispanic male. Further, counsel did not subpoena Senabria.

The trial court concluded that the identity of the declarant who made the statement the suspect was black had not been not established. The court thus held the statement that the robber was a black male was inadmissible "double hearsay." Double hearsay, also known as hearsay-within-hearsay, refers to a situation where a hearsay statement itself contains an additional "statement made by another declarant" that constitutes hearsay. N.J.R.E. 805; see also N.R.E. 801(c) (defining hearsay). Each level of hearsay-within-hearsay "requires a separate basis for admission into evidence." Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 375 n.1 (2010).

Aside from the hearsay problem, the trial court also concluded the black male third-party guilt evidence was inadmissible under N.J.R.E. 403, finding the risk of misleading the jury substantially outweighed any probative value. Important to that determination, the judge reviewed the surveillance video of the

robbery and noted, "the [surveillance] video evidence here shows that the robber is not black."

The trial court's evidentiary ruling excluding the black-male description was not an abuse of discretion. On the contrary, it was clearly correct. The statement is not only hearsay, but a statement made by an unknown declarant. Indeed, there may be no declarant at all, as the statement may be the result of the inadvertent conflation of information from another 9-1-1 call involving an entirely separate incident. In the final analysis, the black male third-party guilt theory is grounded in a description of the robber from an unknown source, and it is flatly contradicted by objective video surveillance evidence of the robbery that, according to the trial court, definitively shows that the perpetrator was not black.

In these circumstances, the trial court correctly found that the black-male description in the audio recording of the dispatch radio transmission is not admissible. Fortin, 178 N.J. at 591. There is no "link between the [third-party guilt] evidence and . . . the crime." Koedatch, 112 N.J. at 301. Further, this evidence does not have a "rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case." Id. at 298 (quoting State v. Sturdivant, 31 N.J. at 179). Accordingly, the trial court properly precluded

15

defendant from presenting this evidence and from arguing the black male third-party guilt hypothesis.

V.

Defendant next argues that the trial court erred in precluding him from arguing the spoliation of the recording of the 9-1-1 call placed on February 5. At the N.J.R.E. 104 hearing discussed in the preceding section of this opinion, the 9-1-1 operator testified that the recording was more "choppy" than normal. Defendant sought to argue that the State deleted portions of recording.

Spoliation is hiding or destroying litigation evidence. Rosenblit v. Zimmerman, 166 N.J. 391, 400–01 (2001) (citing Bart S. Wilhoit, Comment, Spoliation of Evidence: The Viability of Four Emerging Torts, 46 UCLA L. Rev. 631, 633 (1998)). "[T]he spoliator's level of intent, whether negligent or intentional, does not affect the spoliator's liability. Rather, it is a factor to be considered when determining the appropriate remedy for the spoliation." Manorcare Health Servs., Inc. v. Osmose Wood Preserving, Inc., 336 N.J. Super. 218, 226 (App. Div. 2001) (quoting Aetna Life & Cas. Co. v. Imet Mason Contractors, 309 N.J. Super. 358, 368 (App. Div. 1998)). Often a party's spoliation results in an adverse inference charge where the factfinder can

presume that the evidence concealed or destroyed would have been unfavorable to the spoliator.  Rosenblit, 166 N.J. at 401–02.

Although 9-1-1 recordings are generally not as "choppy" as the one in this case, there is no indication that recorded material was erased or otherwise deleted.  As the judge observed in his oral ruling, defendant never requested a Driver[6] hearing to examine the inaudible portions of the recording and to determine whether the recording was incomplete.  As we have already addressed in our discussion of defendant's third-party guilt argument, a description of the suspect in the dispatch radio transmission but not in the precipitating 9-1-1 call can be explained by the dispatcher's conflation of information from another case.  We therefore conclude that the trial court did not abuse its discretion when it precluded defendant from arguing spoliation to the jury and refused to give an adverse inference instruction.

VI.

We turn next to defendant's contention that the trial court erred by refusing to instruct the jury to draw an adverse inference against the State for not calling

---

[6] State v. Driver, 38 N.J. 255 (1962).  A court at a Driver hearing determines whether a sound recording is admissible, considering several factors including whether any changes, additions, or deletions have been made to the recording. Id. at 287.

Senabria as a trial witness. We affirm the trial judge's ruling substantially for the reasons set forth in his oral decision.

In Clawans, the Court held that the "failure of a party to produce before a trial tribunal proof which, it appears, would serve to elucidate the facts in issue, raises a natural inference that the party so failing fears exposure of those facts would be unfavorable to him." 38 N.J. at 170 (citing 2 Wigmore on Evidence § 285 (3d ed. 1940)). The Court further explained, "[t]he failure to call a witness available to both parties has been said to preclude the raising of an inference against either." Id. at 171 (citing O'Neil v. Bilotta, 18 N.J. Super. 82, 86 (App. Div. 1952)).

In State v. Hill, the Court made clear the adverse inference does not apply every time a party chooses not to call a witness who has knowledge of relevant facts. 199 N.J. 545, 561 (2009). To provide meaningful guidance, the Court created a four-part test for trial courts to use in deciding whether to give a Clawans charge. Ibid. The factors are:

> (1) that the uncalled witness is peculiarly within the control or power of only one party, or that there is a special relationship between the party and the witness or the party has superior knowledge of the identity of the witness or of the testimony the witness might be expected to give; (2) that the witness is available to that party both practically and physically; (3) that the testimony of the uncalled witness will elucidate

18

relevant and critical facts in issue[;] and (4) that such testimony appears to be superior to that already used in respect to the fact proven.

[Ibid. (alteration in original) (quoting State v. Hickman, 204 N.J. Super. 409, 414 (App. Div. 1985)).]

In State v. Velasquez, we cautioned trial courts "should not start with the assumption that an absent witness's testimony must be favorable to either one side or the other and an adverse inference must arise against either." 391 N.J. Super. 291, 308 (App. Div. 2007). "In many cases," we added, "the only rational inference is that the witness's testimony would not have been helpful, which is something quite different than unfavorable or adverse." Ibid. Furthermore, when a witness's testimony would be "unimportant to the litigant's case, cumulative[,] or inferior to testimony already presented on the issue, it is more reasonable to infer that non-production is explained by the fact that the testimony is unnecessary." Id. at 308–09 (citing Clawans, 38 N.J. at 171).

In this instance, the trial court carefully applied the Hill factors. With respect to the first factor, the court found Senabria worked for a private company and was not under the control of the State. Although counsel had been provided outdated contact information, the defense could have sought updated contact information from the store or employed an investigator to find her.

19

The judge found with respect to the second factor that both parties had equal opportunity to subpoena her. As to the third factor, the judge reasoned that because the surveillance video showed that the robbery had not been committed by a black male, the police dispatcher's "one-off" comment describing the suspect as a black man was not relevant.

The judge determined that defendant may have established the fourth Hill factor, noting that Senabria's testimony might have been superior to the testimony given by the police officers who testified for the State because they could not remember what the dispatcher had told them about the suspect. However, the judge concluded that even accepting that the fourth factor was established, that factor by itself did not outweigh the other three factors that militated against giving a Clawans charge. The trial judge concluded, "I think such a charge would be inappropriate especially given the Supreme Court's instruction that trial courts must use caution because the consequences of error are severe if a Clawans charge is inappropriately provided."

After reviewing the record in light of the applicable legal standards, we conclude the judge's ruling was not an abuse of discretion. The court made careful findings on the record as required by Hill. 199 N.J. at 561. We agree that in these circumstances, the State's decision not to call her more logically

supports the inference that her testimony would be unhelpful, not "unfavorable." Velasquez, 391 N.J. Super. at 308. We therefore affirm the trial court's denial of defendant's request for a Clawans charge.

VII.

Defendant contends the trial court should have declared a mistrial based on a discovery violation revealed during the State's direct examination of the police dispatcher. The State produced a one-page CAD report that it had not previously disclosed to the defense. The prosecutor explained that after the defense raised the issue concerning the dispatcher's reference to a black male in the radio transmission, the prosecutor reviewed the file, found the CAD report, and realized that it had not been turned over in discovery.

The belatedly disclosed CAD report does not support the black male third-party guilt theory we have addressed in Section III of this opinion. The CAD entry, which apparently was made by the 9-1-1 operator, does not include a description of the suspect. Rather, the CAD entry reports: "the [9-1-1] caller states the gas station attendant was robbed about a week ago. They see the guy who did it walking around the area." In support of his application for a mistrial, defense counsel argued that he would not have referred to the black male in his

opening statement if he had known of the CAD report's existence. The trial court rejected that contention and denied the application.

Mistrials are an "extraordinary remedy" that trial courts should only grant to "prevent an obvious failure of justice." State v. Yough, 208 N.J. 385, 397 (2011) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)). Generally, granting a mistrial is "within the sound discretion of the trial judge." State v. DiRienzo, 53 N.J. 360, 383 (1969). Appellate courts "should not reverse a trial court's denial of a mistrial motion absent a 'clear showing' that 'the defendant suffered actual harm' or that the court otherwise 'abused its discretion.'" Yough, 208 N.J. at 397 (quoting State v. LaBrutto, 114 N.J. 187, 207 (1989)). When a trial court decides a mistrial motion, it "must consider the unique circumstances of the case" and whether an "alternative course of action" less than a mistrial, such as a curative instruction, is appropriate. State v. Smith, 224 N.J. 36, 47 (2016) (citations omitted).

Applying these legal principles to the record before us, we conclude the trial judge did not abuse his discretion in denying the extraordinary remedy of a mistrial. The trial judge aptly noted the issues surrounding the black male reference in the dispatch radio communication were "apparent from the time that discovery reached [defense counsel's] hands whenever that was." Although it is

beyond dispute the CAD report should have been provided in routine pretrial discovery under Rule 3:13-3(b), that document neither added to nor detracted from the black male third-party guilt defense theory counsel alluded to in his opening statement. The CAD entry made by the 9-1-1 operator merely reflected information—and absence of information—contained in the 9-1-1 audio recording that had been timely disclosed to the defense before trial.

Furthermore, counsel was aware of the gas station surveillance video well before his opening statement. The trial court reviewed that video and concluded it shows the robber was white or Hispanic, not African American. In view of the objective video evidence of the robber's race, the trial judge was rightly skeptical that the timely disclosure of the CAD report would have impacted the defense opening statement. In these circumstances, although we do not condone the State's failure to turn over the CAD report before trial, we conclude defendant did not suffer prejudice requiring a new trial.

## VIII.

Defendant contends the trial court erred in denying his request to provide the model jury charge relating to "showup" identifications. In State v. Henderson, the New Jersey Supreme Court explained that, "[s]howups are essentially single-person lineups: a single suspect is presented to a witness to

make an identification.  Showups often occur at the scene of a crime soon after its commission." 208 N.J. 208, 259 (2011).  Showup identifications, moreover, are "inherently suggestive" because the victim can only choose from one suspect who is generally in police custody.  State v. Herrera, 187 N.J. 493, 504 (2006).

We agree with the trial court that there simply was no showup identification in this case. When the two police officers arrived at the gas station in response to the 9-1-1 call, the victim ran to them and pointed directly at the suspect.  The victim had recognized the robber before police were called and kept a watchful eye on the suspect until police arrived.  The trial court was correct in describing this situation as a spontaneous identification, not a showup identification as that term is explained in Henderson and discussed in the model jury charge defendant requested.  In these circumstances, it would have been confusing and inappropriate to give the showup identification model jury instruction.[7]

---

[7]  Defendant argues before us that the trial court's failure to give the showup instruction was "exacerbated" because the victim "had difficulty identifying [defendant] in court."  That assertion requires explication.  During the direct examination of Perdomo, the prosecutor pointed to defendant and asked Perdomo "[d]o you see the man sitting there today?"  In view of the prosecutor's pointing at defendant, the judge prohibited the victim from making an in-court identification.  It therefore is inaccurate to say the victim had "difficultly identifying the defendant" if by that characterization defendant suggests Perdomo had difficulty recollecting the robber's appearance.

We next address defendant's contention, raised for the first time on appeal, that in the course of giving the identification portion of the final instructions to the jury, the trial judge referred inappropriately to "the weapon" rather than "a weapon." The phraseology used by the trial court, defendant asserts, suggested to the jurors that the judge had concluded that a knife had been displayed during the encounter in the gas station. Such a judicial finding of a material element would invade the province of the jurors, because they alone must decide whether the perpetrator used or possessed a knife, which in turn determines whether the robbery is a first- or second-degree crime. N.J.S.A. 2C:15-1(b).

Defendant's contention focuses on a small portion—three words confined in one paragraph—of the final instructions the court read to the jury. In the course of explaining the factors a jury should consider in assessing the reliability of a witness's identification of a perpetrator, the court addressed the effect that the presence of a weapon can have on a witness's ability to perceive and recall the facial features of the perpetrator. The model jury charge refers to this effect as weapon focus. The trial judge told the jury:

> You should consider whether the witness saw the weapon during the incident and the duration of the crime. The presence of the weapon can distract the witness and take witness' attention away from the

perpetrator's face. As a result, the presence of <u>the</u> visible weapon may reduce the reliability of a subsequent identification if the crime is of short duration. In considering this factor, you should take into account the duration of the crime because the longer the event, the more time the witness may have to adapt to the presence of the[8] weapon and focus on other details.

[(emphasis added) (showing deviations from the model jury charge).]

The language employed by the trial court follows nearly verbatim the model jury charge, except the model charge generally refers to "a" weapon rather than "the" weapon. <u>Model Jury Charges (Criminal)</u>, "Identification: Out-of-Court Identification Only" (rev. July 19, 2012). Defendant did not challenge this instruction before the jury retired as required by <u>Rule</u> 1:7-2.[9] However, we

---

[8] We note in the interest of completeness that on this last occasion within the paragraph, the model charge refers to "the" weapon. We offer no explanation for this apparent inconsistency in the text of the model charge and draw attention to it only to underscore our conclusion that use of the word "the" rather than "a" does not constitute plain error.

[9] That rule provides in pertinent part:

[N]o party may urge as error any portion of the charge to the jury or omissions therefrom unless objections are made thereto before the jury retires . . . . A party shall only be prejudiced by the absence of an objection if there was an opportunity to object to a ruling, order or charge.

26

can still review defendant's claim under the plain error standard. See State v. Bunch, 180 N.J. 534, 541 (2004) (considering a defendant's claim under the plain error standard when the defendant did not challenge the jury instruction below). In doing so, we do not look at alleged misstatements in isolation. State v. Wilbely, 63 N.J. 420, 422 (1973) (citing State v. Council, 49 N.J. 341, 342 (1967)). Rather, we read the jury charge as a whole, looking at its overall effect. Ibid. (citing Council, 49 N.J. at 342). In this instance, the jury instructions span almost fifty pages of the trial transcript.

We agree with defendant that the trial court should not have strayed from the language in the model jury charge, and we are thus constrained to hold that the court erred in substituting the word "the" for "a" on three occasions in close succession. However, we conclude that this error was not capable of producing an unjust result, Rule 2:10-2, and thus affords no basis to overturn the jury verdict.

Notably, other parts of the jury instruction that explain the material elements of the robbery and weapons offenses made clear to the jury that the State bears the burden of proving beyond a reasonable doubt that defendant

_____

[Ibid.]

27                                                                    A-5327-16T3

possessed the weapon.  With respect to the armed robbery charge, for example, the jury was instructed "the State must prove beyond a reasonable doubt that the defendant was armed with, used, or threatened an immediate use of a deadly weapon."  The trial court further explained to the jury that "armed with a deadly weapon means defendant possessed and had immediate access to a deadly weapon," and that, "[i]n order for a person to be armed with a deadly weapon, the State must first prove beyond a reasonable doubt that he was in possession of it."  The judge also provided proper instructions on the definition of the term "possess."  Aside from the instruction pertaining to the first-degree robbery charge, the court also properly instructed the jury on the counts charging unlawful possession of a weapon and possession of a weapon for an unlawful purpose.

We are mindful that as a general matter, erroneous jury charges are "poor candidates for rehabilitation under the harmless error philosophy."  State v. Simon, 79 N.J. 191, 206 (1979).  Even so, in these circumstances, we do not hesitate to conclude the jury understood that it was for them to decide whether the robber possessed and used a knife.  In sum, when the instructions the court gave the jury are read as a whole, it is evident that the trial court's isolated substitution of the article "the" for the article "a" in a single paragraph of a fifty-

28

page charge does not rise to the level of plain error clearly capable of producing an unjust result. R. 2:10-2.

X.

Defendant argues that he was denied the right to a fair trial by the cumulative effect of the errors he asserts. See State v. Jenewicz, 193 N.J. 440, 473 (2008) ("[E]ven when an individual error or series of errors does not rise to reversible error, when considered in combination, their cumulative effect can cast sufficient doubt on a verdict to require reversal."). As we have noted, we conclude that only one error was committed at trial, and that error does not warrant reversal. We therefore turn to defendant's sentencing argument.

Defendant, who stands convicted of first-degree robbery, contends that the trial court should have sentenced him to a term appropriate to a second-degree crime pursuant to N.J.S.A. 2C: 44-1(f)(2). We conclude that the trial judge acted within his discretion in declining to downgrade defendant's sentence.

We apply a deferential standard when reviewing sentencing. State v. Fuentes, 217 N.J. 57, 70 (2014). We look to whether the sentencing court abused its discretion. State v. Blackmon, 202 N.J. 283, 297 (2010). Furthermore, our Supreme Court has made clear that we should not substitute our judgment in

place of the trial court, even if we might have sentenced differently, as long as the trial court properly balanced the relevant factors and explained how it reached the sentence. State v. O'Donnell, 117 N.J. 210, 215 (1989) (citing State v. Jarbath, 114 N.J. 394, 400–01 (1989)).

The statute defendant relies upon provides:

> In cases of convictions for crimes of the first or second degree where the court is clearly convinced that the mitigating factors substantially outweigh the aggravating factors and where the interest of justice demands, the court may sentence the defendant to a term appropriate to a crime of one degree lower than that of the crime for which he was convicted.
>
> [N.J.S.A. 2C:44-1(f)(2).]

In State v. Megargel, the Court provided guidance on when a defendant's first- or second-degree conviction should be downgraded pursuant to this statutory framework. 143 N.J. 484, 496 (1996). The Court established a two-part test: (1) "[t]he court must be 'clearly convinced that the mitigating factors outweigh the aggravating ones'" and (2) "that the interest of justice demand[s] a downgraded sentence." Ibid. (quoting N.J.S.A. 2C:44-1(f)(2)). The Court further explained that in applying this test, the severity of the crime is the most important factor. Id. at 500 (citing State v. Hodge, 95 N.J. 369, 379 (1984)). When evaluating severity, a sentencing court should "consider the nature of and

the relevant circumstances pertaining to the offense," including if the surrounding circumstances make the offense similar to a lower degree offense. Ibid. Although sentencing courts can consider "facts personal to the defendant," the focus should be the crime itself. Id. at 501 (citing Jarbath, 114 N.J. at 407).

In this instance, the trial court carefully considered defendant's request for a sentencing downgrade. We take note that defendant does not appear to challenge the trial court's weighing of the aggravating and mitigating factors. Rather, defendant broadly argues his sentence is unconscionable and shocks the judicial conscience, even though he received the lowest term of imprisonment possible in the first-degree sentencing range[10] of ten to twenty years. N.J.S.A. 2C:43-6(a)(1). Defendant has presented us with no reason upon which we might conclude that the sentencing judge, who oversaw the trial, abused his discretion in declining to downgrade defendant's robbery conviction.

To the extent we have not already addressed them, any other arguments raised by defendant with respect to his convictions or sentence do not have sufficient merit to warrant discussion in this written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[10] We note that the sentence defendant received also falls within the sentencing range for second-degree crimes. N.J.S.A. 2C:43-6(a)(2).

A-5327-16T3