# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5466-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ALVIN TAYLOR,
a/k/a ALVIN TAYLOR, JR.,
DAVID SEEGERS, ALVIN
DAVIS, ALVIN JR., and
CALVIN TELLER,

     Defendant-Appellant.

_____

     Submitted February 14, 2022 – Decided March 8, 2022

     Before Judges Vernoia and Firko.

     On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 17-01-0033.

     Joseph E. Krakora, Public Defender, attorney for appellant (Frank M. Gennaro, Designated Counsel, on the brief).

     Matthew J. Platkin, Acting Attorney General, attorney for respondent (Kaili E. Matthews, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant Alvin Taylor appeals from his convictions after a jury trial for second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (count one); first-degree robbery, N.J.S.A. 2C:15-1 (count three); first-degree carjacking, N.J.S.A. 2C:15-2(a)(1) (count four); first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(6) (count five); and third-degree aggravated criminal sexual contact, N.J.S.A. 2C:14-3(a) (count six).[1]  He also appeals from his concomitant aggregate sentence of forty-five years' imprisonment, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.  We affirm his convictions. However, we remand for resentencing under State v. Torres, 246 N.J. 246 (2021), and for amendment of the judgment of conviction (JOC) to reflect that the sentencing court imposed consecutive five-year periods of parole supervision following defendant's release under NERA.

I.

We briefly summarize the facts derived from the record.  L.R.[2] worked at a "gentleman's club" in Passaic as a bartender and exotic dancer.  Routinely, she

---

[1]  The jury acquitted defendant of count two, third-degree terroristic threats, N.J.S.A. 2C:12-3(b).

[2]  We use initials to protect the identity of the victim.  R. 1:38-3(c)(12).

would dance on stage and converse with patrons off-stage, "have a drink with them, and then they would" tip her. Patrons were required to respect the dancers and not touch them.

On September 12, 2016, around 10:30 p.m., L.R. was waved down by a patron, Jarrod Rodgers,[3] while dancing on-stage. After finishing her dance, L.R. approached and conversed with Rodgers and described him as very polite and respectful. She testified he "just really wanted to talk to me, and purchase me [a] drink." While conversing, L.R. and Rodgers exchanged Instagram profiles.

At some point during L.R.'s conversation with Rodgers, defendant approached L.R., "yanked" her by her arm close to him and tried to kiss her. In response, Rodgers "grabbed [her] back" and apologized to L.R. for defendant's behavior. L.R. claims Rodgers stated, "I'm sorry my boy is wild, . . . I don't know what the fuck is wrong with him."

L.R. described defendant as "big," "stocky," and "dark skin[ned]." She testified defendant "had a goatee or like a beard kind of thing going around his chin, jaw and . . . mouth" and wore "a black and red hat, a white t-shirt," "a silver chain or two," and "a big watch." L.R. claimed although the gentleman's club

---

[3] The record is unclear as to the correct spelling of Jarrod Rodgers's name. In this opinion, we will refer to him as Rodgers.

had dim lighting, she could see defendant fairly well because "the strobe lighting and stuff . . . [made] it bright in there."

Throughout the rest of the night, defendant continuously tried to "grab" L.R. and get her attention. At approximately midnight, Rodgers left the club, but defendant remained at the club, along with "maybe" ten other customers. At or about 2:20 a.m., defendant stopped L.R., and the two conversed for a few minutes "face-to-face." Ten minutes later, L.R. was told to leave because the club was closing. As L.R. left the club, she noticed defendant and the bartenders arguing, alerting the club's security.

Outside of the club, L.R. crossed the street to her car. While L.R. was placing her bags in her backseat, which contained both L.R.'s cellular phone and cash earned that night, defendant approached L.R. outside of her car. He asked L.R. for a ride, claiming he had spent all his money at the club and did not have a way home. In response, L.R. agreed to drive defendant home. She testified:

> I didn't see security there, I didn't see police, the police cars that are normally there, and I felt like . . . [I was] trapped. Like I was scared, I didn't . . . know what to— what to say. . . . I was scared to say—to say no, because he was just arguing with the bartenders, he had been a little bit aggressive toward me and other girls throughout the night, and I was there by myself with no one around me. And I don't know I . . . just felt like . . . it was in my car, . . . I was in control. Like if anything, I could tell him to get out, and . . . I would be fine.

4

When L.R. asked defendant where he wanted her to take him, defendant merely responded "he was going to let [her] know." During the ride, defendant introduced himself as "Bodi" and twice attempted to touch L.R.'s vagina. After L.R. told defendant to stop the second time, "he got really mad" and told her "where to go to drop him off." Defendant then instructed L.R. to drop him off in a parking lot behind Triangle Village apartment complex in Paterson. When L.R. attempted to drop defendant off "at the entrance of the parking lot, he . . . told [her] to continue going up into a parking spot." Once L.R. parked the car in the spot, however, defendant refused to leave her car and grabbed the key from the ignition.

L.R. testified she:

> [K]ept looking at the time and wondering why [defendant was] not trying to get out. He kept just trying to talk to me. And I was like all right, well, I got to go you know, your home, you know have a good night. And he told me no, that he didn't want to leave, he didn't want to get out.
>
> . . . .
>
> . . . And I kept telling him that I had to go, and I needed—you know I had to go home. And he was saying no, that he wanted to hang out, that he wanted to like mess around and stuff. So, I'm telling him like no, I'm not like that. I got to go, you got to get out of my car, get out like go. And he didn't like that, . . . he says no. And he reaches over and he grabs the key from my

5

A-5466-18

ignition, and I start telling him like just give me my key back. And I'm arguing with him to get my key from his hand. I'm like give me my key back, give me my key. Just get out, just go, and he would not leave. And then he tells me to calm down before he knocks me the fuck out.

. . . .

. . . I just—I remember asking him to go, just to please give me my key, to go, just to get out, like just to go. Just I wanted to go home, he could go, nothing was going to happen. And he told me no. And I asked why he was doing this to me? And he told me that if he didn't do it to me someone else was going to do it to me. And I told him that my boyfriend was going to call me. And he told me that if someone was going to call me, they would have called me already, that no one was looking for me.

L.R. attempted to distract defendant to no avail. "[H]e told me . . . [t]o stop playing around or stop messing around, that I was getting him mad." Defendant then ordered L.R. to lift her shirt because he wanted to suck her breast. He proceeded to suck her right breast. When he finished, he told L.R. "he wanted her to perform oral sex on him," and would "beat" her if she refused.

L.R. testified at that time, she knew she "had to remember things about [defendant] if [she] ever wanted to catch him." At trial, L.R. testified when defendant unbuckled his pants, she saw a circular tattoo "on the top of the side of [defendant's] stomach." She also claimed defendant told L.R. about a new

6

A-5466-18

tattoo on his chest, which he wanted her to rub Vaseline on. The record shows defendant has "a basketball tattoo on his abdomen and a skull tattoo on his chest."

While L.R. performed oral sex on defendant, defendant grabbed L.R.'s bag from the backseat and removed her cash. He then instructed L.R. "to get on top of him" so they could have sex in the car. When L.R. attempted to distract defendant, he told her she "was really starting to piss him off, and that [she] had to have sex with him." In response, L.R. agreed to "get on top" but asked defendant to remove his shirt first so she would not get her makeup on it. When defendant lifted his shirt over his eyes, L.R. attempted to flee the car, but was grabbed by defendant when she leaned back in for her bag, which still contained her cellular phone.

Defendant grabbed L.R.'s arm, pulled her close, and punched her twice "real hard" in her left eye. After screaming, defendant began yelling at her "to shut the fuck up, and get back in the car." L.R. agreed to get back in but when defendant let go of her arm, she started running and "screaming at the top of [her] lungs for help." L.R. testified she felt "this really big hit to [her] head," which "came again and again in the back of [her] head" and she fell to the ground where defendant continued to hit her. When defendant stopped, he helped L.R.

7

A-5466-18

back to her feet and instructed her to return to the car. Instead, L.R. "turned around and . . . started running again . . . screaming for help." Defendant again caught up to L.R. and again knocked her to the ground where he continued to beat her.

After a struggle, defendant got into L.R.'s car, turned it on, and shifted the car into reverse to leave. L.R. attempted to grab onto the car to stop defendant from driving away, but he shifted the car into drive and "took off." Defendant dragged L.R. for approximately four to five seconds before she lost her grip. The entire ordeal, from when L.R. first drove her car into the parking lot with defendant to when he left alone with her car, spanned approximately twenty minutes.

When the police arrived in response to a 9-1-1 call from an unidentified caller, L.R. gave them a description of defendant. She "told them that he was wearing a black and red hat, a white shirt, a silver chain, a watch. He was a[n] African/American man, big . . . ." L.R. was transported to Saint Joseph's University Medical Center, where she provided the police with "a small statement" and a second description of defendant. She told them:

> [H]e was a black male about 200 pounds, he [w]as big. He had like a goatee or . . . like a mustache . . . . [She] told them what he was wearing[,] . . . a black and red

hat, a white shirt, a silver chain, a watch, and that he
. . . told [her] his name was Bodi.

L.R.'s injuries included: (1) an orbital fracture; (2) two broken bones in her right forearm, which required complex surgery; and (3) cuts, scrapes, and bruising. A DNA swab was taken from her right breast. She was distraught, confused, and afraid.

At or about 3:30 a.m., the police located L.R.'s car. Thirty minutes later, Officer Peter Pogorzelski and Nero, a K-9 Belgian Malinois, reported to the scene. Nero was able to pick up defendant's scent from L.R.'s car, but lost the scent approximately a block-and-a-half from defendant's last known address.

At the time of trial, Officer Pogorzelski had been Nero's handler for approximately four years. Both Officer Pogorzelski and Nero: (1) "underwent extensive nine-month academy training," based on the guidelines set forth by the New Jersey Attorney General's Office; (2) "were certified to patrol for the police department"; (3) recertified biannually; (4) trained on a weekly basis; and (5) regularly attended seminars. Officer Pogorzelski and Nero have worked on over 200 crime scenes.

After leaving the hospital, L.R. reached out to one of her managers for assistance in identifying defendant. L.R.'s manager instructed her to search for a photograph of defendant on Instagram under the hashtag "striptostrip." L.R.

A-5466-18

found four images of Rodgers "and the people who he was originally" with on the night of September 12, 2016, including defendant. L.R. testified that in the subject photograph, defendant was wearing "around his neck the silver chain," "his watch on his left hand," and "the black and red hat."

A day or two after leaving the hospital, L.R. reached out to Rodgers on Instagram to ask for "his help finding [defendant's] information, because [she] believe[d] that they're friends." In response, Rodgers informed L.R. "he didn't like know him, know him, but he knew him, and that he was going to try to help [her] as best as he could." The next day, Rodgers forwarded L.R. a photograph of defendant containing his name and date of birth, which L.R. immediately recognized as her attacker. L.R. called the police to inform them she had located the person who had assaulted her and provided them with defendant's full name and date of birth and identified him as "Alvin Taylor." His last known address was a few minutes' walk from where the offenses took place.

On September 16, 2016, L.R. gave a statement to the police. She showed them the photograph of Rodgers and defendant. The police proceeded to show L.R. photographs of other men, but she "pretty much told them that they didn't need to just give [her] a lineup. That [she] knew who attacked [her]." On

A-5466-18

January 17, 2017, a Passaic County grand jury returned Indictment Number 17-01-00033 against defendant.

At a pre-trial hearing, Rodgers denied knowing L.R. or a dancer known as "Journey," who is presumably L.R. He also did not recall the events which took place on the evening of September 12, 2016, and denied knowing defendant. Rodgers also denied sending the photograph of defendant to L.R. or having a conversation with anyone at the club.

Prior to trial on March 26, 2019, the trial court conducted a Rule 104 hearing[4] regarding the State's motion seeking to introduce testimony relating to L.R.'s private photo identification of defendant. The court granted the State's motion[5] but precluded the State from presenting evidence of L.R.'s identification

---

[4] "The court shall decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible." N.J.R.E. 104(a)(1).

[5] The trial court held L.R.'s testimony relating to her private photo identification of defendant, including her interactions with Rodgers, was not inadmissible hearsay, see Rule 801, because the testimony was not being offered "for the truthfulness of its contents but only to show that the statement was, in fact, made, and that [L.R.] took certain action as a result," (quoting Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 4 on N.J.R.E. 801 (2019)). Although the trial court admitted L.R.'s testimony on this issue, the trial court also held such testimony would be given a limiting instruction. When L.R. testified before the jury, however, no limiting instruction was given, and none was provided in the jury charge. Defendant, however, neither objected to its omission at trial nor raises this issue on appeal. Therefore, the issue is waived.

11

of defendant through police procedures.[6] A memorializing order was entered that day. On April 2, 2019, the trial court conducted a second Rule 104 hearing relative to the State's motion to introduce expert testimony from Officer Pogorzelski as Nero's dog handler and as to what Nero did during the tracking. The State's motion was granted with the proviso that a limiting instruction would be provided to the jury indicating the dog tracking evidence was not dispositive of defendant's guilt or innocence. On April 4, 2019, defendant requested the trial court provide an adverse inference jury instruction regarding the State's decision not to call Rodgers as a witness in its case in chief. The court denied defendant's motion and entered a memorializing order.

At trial, the State's DNA forensic analyst testified the DNA swab of L.R.'s right breast generated a partial Y-STR profile.[7] The DNA expert stated some of

---

See Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011) ("An issue not briefed on appeal is deemed waived.").

[6] The trial court held evidence of L.R.'s police-initiated identification was inadmissible because police procedures were not followed in respect of defendant's identification. Therefore, the trial court limited L.R.'s identification testimony to her private photo identification and in-court identification.

[7] Y-STR stands for short tandem repeat on the Y-chromosome. A DNA profile is compared to the general population and analyzed to ascertain the frequency of occurrence in the general population. Therefore, if you are looking for a male DNA profile, the focus is on the Y chromosome, passed down from father to

the DNA may have been taken off by L.R.'s clothing or just not enough DNA was deposited to allow for a full profile. Defendant's DNA profile matched the partial Y-STR profile, "[h]owever, due to paternal inheritance . . . it [was] expected that all [defendant's] paternal relatives" matched as well. On cross-examination, the expert testified she expected the partial Y-STR profile would be seen in one of every forty-four male African Americans. The jury rendered its verdict on April 8, 2019.

On June 11, 2019, the court sentenced defendant to twenty-five years' imprisonment on count four, first-degree carjacking, and twenty-years' imprisonment on count five, aggravated sexual assault. Both sentences were subject to an eighty-five percent period of parole ineligibility under NERA. The trial court dismissed count two, third-degree terroristic threats, and merged counts one and three, second-degree aggravated assault and first-degree robbery respectively, with count one, and count six, third-degree aggravated criminal sexual contact, with count five. The court also sentenced defendant to Megan's Law registration, N.J.S.A. 2C:7-1 to -19, and Parole Supervision for Life, N.J.S.A. 2C:43-6.4, and it imposed the requisite fines and penalties.

---

son. See State v. Calleia, 414 N.J. Super. 143-52 (App. Div. 2010), rev'd on other grounds, 206 N.J. 274 (2011).

13

On appeal, defendant raises the following arguments:

POINT I

THE VICTIM'S PHOTO IDENTIFICATION OF DEFENDANT WAS IMPROPERLY ADMITTED.

POINT II

THE TRIAL COURT ERRED BY ADMITTING UNRELIABLE DOG TRACKING EVIDENCE.

POINT III

DEFENDANT WAS ENTITLED EITHER TO AN ADVERSE INFERENCE JURY INSTRUCTION, OR TO THE OPPORTUNITY TO ARGUE IN SUMMATION AS TO THE STATE'S FAILURE TO PRODUCE JARROD RO[D]GERS AS A TRIAL WITNESS.

POINT IV

THE AGGREGATE SENTENCE OF [FORTY-FIVE] YEARS SUBJECT TO [NERA] IS EXCESSIVE.

II.

Defendant argues the trial court erred by allowing L.R. to testify about her out-of-court identification of defendant through the photograph she received from Rodgers. Specifically, defendant argues the photograph identification evidence was improperly admitted because: (1) "the trial court failed to conduct

a proper preliminary hearing," i.e., a <u>Henderson</u>[8] hearing; (2) "the State failed to prove the evidence reliable"; and (3) "the circumstances of the identification created a substantial likelihood of an irreparable misidentification." In response, the State argues "L.R.'s identification of defendant was based on her own memory and interactions with defendant and not that of a private actor."[9]

To obtain a <u>Henderson</u> hearing, a defendant first "must present evidence that the identification was made under highly suggestive circumstances that could lead to a mistaken identification."[10] <u>Chen</u>, 208 N.J. at 327. The principal

---

[8] <u>State v. Henderson</u>, 208 N.J. 208 (2011). A <u>Henderson</u> hearing is a preliminary hearing with specific regard to the admissibility of a witness's identification. <u>See</u> <u>State v. Anthony</u>, 237 N.J. 213, 218 (2019). It is more commonly referred to as a <u>Wade</u> hearing. <u>U.S. v. Wade</u>, 388 U.S. 218 (1967); <u>see, e.g.</u>, <u>Anthony</u>, 237 N.J. at 218, 221; <u>Henderson</u>, 208 N.J. at 222; <u>State v. Chen</u>, 208 N.J. 307, 310 (2011).

[9] The State claims L.R.'s identification of defendant was "through a confirmatory identification." A "confirmatory identification" generally does not require a <u>Henderson</u> hearing because it is not considered suggestive. <u>State v. Pressley</u>, 232 N.J. 587, 592 (2018). "A confirmatory identification occurs when a witness identifies someone he or she knows from before but cannot identify by name." <u>Id.</u> at 592-93. The State argues defendant's identification was a confirmatory identification because: (1) "L.R. had multiple encounters with defendant"; (2) L.R. knew defendant's "street name," i.e., "Bodi"; and (3) L.R. had already identified defendant in a photograph on Instagram.

[10] In <u>Chen</u>, our Court distinguished between the need for a preliminary hearing regarding the admissibility of identification evidence involving suggestive police conduct and private actor conduct. 208 N.J. at 326-28. Whereas a

concern regarding the admissibility of identification evidence involving private actor conduct is reliability. Id. at 326. If the defendant satisfies his or her initial burden, then the State must "offer proof to show that the proffered eyewitness identification is reliable." Henderson, 208 N.J. at 289. The ultimate burden, however, "remains on the defendant to prove a very substantial likelihood of irreparable misidentification." Ibid.

"[I]f after weighing the evidence presented [the] [trial] court finds from the totality of the circumstances that defendant has demonstrated a very substantial likelihood of irreparable misidentification, the court should suppress the identification evidence." Ibid. Alternatively, "[i]f the evidence is admitted, the court should provide appropriate, tailored jury instructions." Ibid. A "very substantial likelihood of irreparable misidentification" is a difficult burden to satisfy. See Chen, 208 N.J. at 328 ("In rare cases, . . . highly suggestive

---

defendant's burden in cases involving police action requires merely "some evidence of suggestiveness," Henderson, 208 N.J. at 288; see also Anthony, 237 N.J. at 233 (holding a defendant is entitled to a Henderson hearing if police procedures "are not followed and no electronic or contemporaneous, verbatim written recording of the identification procedure is prepared"), cases involving no police action "require a higher, initial threshold of suggestiveness[,] . . . namely, some evidence of highly suggestive circumstances as opposed to simply suggestive conduct," Chen, 208 N.J. at 327. The Court held this is the only difference between the two tests. Ibid.

procedures that so taint the reliability of a witness' identification testimony will bar that evidence altogether."). "[I]n most cases, identification evidence will likely be presented to the jury" and "[i]t will remain the jury's task to determine how reliable that evidence is, with the benefit of cross-examination and appropriate jury instructions." Ibid.

Defendant argues the trial court failed to conduct a proper Henderson hearing. In addition, defendant argues "the trial court was obligated to consider and weigh the various system and estimator variables detailed in [Henderson]" when "[f]aced with the highly suggestive conduct of [Rodgers]," i.e., Rodger's provision of defendant's "mugshot," name, "and the fact that he had been incarcerated."

During a Henderson hearing, a trial court is required to "evaluate relevant system and estimator variables,"[11] i.e., "the suggestive nature of the

_____

[11] "System variables" are variables "within the control of the criminal justice system." Henderson, 208 N.J. at 218 (emphasis added). "Estimator variables" are variables "over which the legal system has no control," such as "lighting conditions or the presence of a weapon." Ibid. (emphasis added). Here, defendant's argument relies, in part, on the presence of "system variables" within L.R.'s photo identification of defendant. Rather, the Court in Chen justified, in part, the need for a higher, initial threshold of suggestiveness due to difficulties in expecting private actors to "conform their behavior to police standards they are unaware of." 208 N.J. at 326. As such, a trial court may not find "system

identification procedure," and consider the victim's "opportunity to view the attacker before and during their struggle, her attentiveness, and the accuracy of her initial description to the police, among other relevant factors." Chen, 208, N.J. at 327, 329. The trial court may end the hearing, however, if the trial court "finds from the testimony that [the] defendant's threshold allegation of suggestiveness is groundless." Id. at 327. The threshold allegation of suggestiveness is groundless if completely based on estimator variables. See Henderson, 208 N.J. 290-91. Evidence of estimator variables is "reserved for the jury." Id. at 291.

But here, the trial court was not required to specifically weigh the various system and estimator variables. The trial court was merely required to find defendant's threshold allegation of suggestiveness to be groundless, Chen, 208 N.J. at 327, 329, which the court so found. First, the trial court considered L.R.'s opportunity to view defendant, noting "she had ample opportunity to make observations of [defendant] . . . in the bar while she was dancing[,] . . . doing her rounds[,] . . . . [a]nd then while she was in the car with him right into the end." Second, the trial court considered the suggestive nature of the

_____

variables" in a private photo identification absent the inclusion of police conduct.

identification procedure, finding Rodgers "didn't suggest anything to her." The court emphasized:

> [T]here was no testimony that [Rodgers] wrote this is the guy I was talking to, this was the guy that assaulted you, or—there was nothing said, but he sent her the photograph. And at that point, she recognized him or believed that was the man that attacked her.
>
> So there's no taint there. There's no suggestiveness.

Because the trial court determined defendant's threshold allegation of suggestiveness to be groundless, the court was permitted to end the hearing absent specific findings regarding the various system and estimator variables.

Next, defendant argues the State failed to prove the evidence reliable. "[T]estimony from [Rodgers] was the vital link supporting the identification. Yet, [Rodgers] destroyed that link[] [when he] testif[ied] that he didn't know L.R., had no memory of the events of September 12[,] he did not know the man in the photo, and he did not send it to L.R." However, the State is only required to prove the identification reliable if the defendant satisfies his or her initial burden. Henderson, 208 N.J. at 289.

We conclude, the trial court did not abuse its discretion in finding that defendant had failed to show the identification was made under highly

suggestive circumstances. Consequently, the State was not required to prove the evidence was in fact still reliable. Chen, 208 N.J. at 327.

Finally on this point, defendant argues "the circumstances of the identification created a substantial likelihood of an irreparable misidentification." "[T]he ultimate burden remains on the defendant to prove a very substantial likelihood of irreparable misidentification." Henderson, 208 N.J. at 289. Defendant, however, does not specify how L.R.'s identification created a substantial likelihood of an irreparable misidentification. "An issue not briefed on appeal is deemed waived." Sklodowsky, 417 N.J. Super. at 657. Defendant has waived this issue. Here, the record supports the trial court's determination that L.R.'s out-of-court photo identification was admissible because defendant failed to show L.R.'s identification created a substantial likelihood of an irreparable misidentification.

III.

Next, defendant argues the trial court erred by admitting Officer Pogorzelski's expert testimony on the techniques for using dogs to track suspects and explained Nero's behavior while tracking defendant. Under Rule 702 "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as

an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." N.J.R.E. 701. Rule 702 "clearly permits the admission of testimony regarding [dog] tracking [evidence]," so long as "a foundation is first laid." State v. Wanczyk, 196 N.J. Super. 397, 403 (Law Div. 1984), rev'd on other grounds, 201 N.J. Super. 258 (App. Div. 1985).

In State v. Parton, adopting the trial court's "comprehensive analysis and conclusions on the subject" from Wanczyk, we discussed the

> universally accepted prerequisites to the admission of testimony regarding dog tracking:
>
> 1. The dog's handler must have sufficient knowledge, skill, training or experience to evaluate the dog's actions.
>
> 2. Once qualified as an expert, the handler must give testimony about the particular dog used and that the dog
>
> > a. is of stock characterized by acute scent and power of discrimination and that this particular dog possessed those qualities;
> >
> > b. was trained and tested and proved to be reliable in the tracking of human beings;
> >
> > c. was laid on a trail where circumstances tended to show that the suspect has been, or a track which circumstances indicated was made by the suspect; and

> d. followed the scent or track to or towards the suspect's location and that the dog was properly handled during tracking.
>
> 3. After this foundation has been laid, the handler may testify as to what the dog did during the tracking and give his [or her] interpretation and opinion of the dog's actions.
>
> [Parton, 251 N.J. Super. 230 (App. Div. 1991) (emphasis added).]

Before admitting the K-9 officer's testimony, the trial court must adhere to Parton's analysis and ascertain if the officer's testimony qualifies for admission as expert testimony. If admitted, the jury should be properly instructed as to the use to which it may put that expert testimony. See Model Jury Charge (Criminal), "Expert Testimony" (rev. Nov. 10, 2003).

Here, defendant never contended that dog handling and tracking was an unfit subject for expert testimony and never disputed "Officer Pogorzelski's ability to interpret [Nero]'s actions." Rather, defendant argues: (1) Nero was an unreliable tracker due to his breed and inexperience; and (2) the probative value of the dog tracking evidence was outweighed by its undue prejudice under Rule 403.[12]

---

[12] Defendant argues the probative value of the evidence "was extremely limited," whereas the evidence was unduly prejudicial because "[t]he jury was

Nero is a Belgian Malinois, "a stock characterized by acute scent and power of discrimination." Parton, 251 N.J. Super. at 233; see State v. Brewer, 875 S.W.2d 298, 301 (Tenn. Crim. App. 1993)[13] (upholding the admission of testimony regarding dog tracking evidence where the dog was a Belgian Malinois). Pogorzelski testified to the widespread and common use of Belgian Malinois as tracking dogs.

Here, Nero also possessed the necessary training and credentials to indicate an acute scent, power of discrimination, and reliability. Nero: (1) "completed nine months of training, completes continual training with his handler on a monthly basis, and is certified biannually in accordance with the Attorney General's requirements"; (2) has worked with Officer Pogorzelski at over 200 crime scenes; and (3) there were several cases, approximately twenty-six, "in which the dog successfully tracked suspects," Parton, 251 N.J. Super. at 234. A tracking dog's certification may be evidence of a dog's reliability. See Florida v. Harris, 568 U.S. 237, 246 (2013) (opining on the reliability of scent

---

treated to the story of a classic manhunt." Any potential prejudice, however, was reasonably abated by the trial court's limiting jury instructions on this evidence.

[13] No New Jersey court has reviewed the issue of whether a Belgian Malinois is of the stock characterized by acute scent and power of discrimination.

detection dogs, noting "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to" find a dog reliable); see also Attorney General Guidelines for K-9 Training Standards and Qualification Requirements for the New Jersey Law Enforcement, § 2.3 (rev'd July 2002), available at https://www.state.nj.us/lps/dcj/agguide/k9_policy_2002.pdf (listing qualification requirement for law enforcement tracking dogs).

Defendant also argues the prejudicial value of the State's dog tracking evidence outweighed its probative value because the State could not prove Nero was in fact tracking defendant. In particular, defendant argues the street where Nero lost the scent "was in the vicinity of . . . the address the police had on file for [d]efendant. However, it was unclear whether [d]efendant was at [that address] any time on September 13[]. Defendant was not arrested on September 13[] [and] was not subsequently arrested at [that address]," and therefore, since Nero never actually led the police to defendant, the State's dog tracking evidence lacked probative value under Rule 403. Again, we disagree.

Under the Parton standard, Nero was not required to find defendant. For admission of the tracking evidence, it was sufficient to prove that the dog "followed the scent to or towards the suspect's location and that the dog was

properly handled during the tracking." 251 N.J. Super. at 234 (emphasis added). In Parton, we explained that tracking evidence is, "at best, circumstantial and corroborative evidence[,] which the jury is free to accept or reject." Id. at 235. The State was not required to prove Nero found defendant nor that he was in fact the person Nero was tracking; it was sufficient that Nero was a reliable tracker and Officer Pogorzelski properly handled Nero during the tracking. See id. at 233-34.

Saliently, the trial court found Nero's tracking to be reliable, although not conclusive, noting "[H]e's close enough under all the circumstances." Moreover, the jury was free to accept or reject the fact that Nero tracked defendant's scent approximately a block-and-a-half from defendant's last known address. The success of tracking evidence goes to the weight of the evidence, not its admissibility. The trial court did not abuse its discretion in admitting Officer Pogorzelski's expert testimony relating to the State's dog tracking evidence because the State did not need to conclusively prove Nero was in fact tracking defendant.

A-5466-18

IV.

Next, defendant argues the trial court erred by denying defendant an adverse inference charge, i.e., a Clawans[14] charge, with relation to Rodgers or, in the alternative, permission to mention Rodger's absence in summation. A Clawans charge stems from the principle the failure of a party to produce a witness "raises a natural inference that the party so failing fears exposure of those facts would be unfavorable to him [or her]." 38 N.J. at 170. There are a multitude of reasons, however, why a party may choose not to call a witness. State v. Velasquez, 391 N.J. Super. 291, 307-08 (App. Div. 2007). A trial court must exercise caution before granting a party's request for a Clawans charge and must evaluate the party's reason for not calling the witness. Id. at 306-08; State v. Hill, 199 N.J. 545, 562 (2009).

Before granting a Clawans charge, the trial court must consider "all relevant circumstances" and find:

> (1) that the uncalled witness is peculiarly within the control or power of only the one party, or that there is a special relationship between the party and the witness or the party has superior knowledge of the identity of the witness or of the testimony the witness might be expected to give; (2) that the witness is available to that party both practically and physically; (3) that the testimony of the uncalled witness will elucidate

---

[14] State v. Clawans, 38 N.J. 162 (1962).

A-5466-18

> relevant and critical facts in issue [;] and (4) that such testimony appears to be superior to that already utilized in respect to the fact to be proven.
>
> [Hill, 199 N.J. at 561-62 (alteration in original) (quoting State v. Hickman, 204 N.J. Super. 409, 414 (App. Div. 1985)).]

A Clawans charge "is proper only when it can be said 'with reasonable assurance that it would have been natural for a party to have called the absent witness but for some apprehension about his testimony.'" Velasquez, 391 N.J. Super. at 306 (quoting Burgess v. U.S., 440 F.2d 226, 237 (D.C. Cir. 1970)).

A party requesting a Clawans charge, or seeking approval to make comments in summation, must make it clear to the trial court and opposing counsel "at the close of his [or her] opponent's case, of his [or her] intent to so request and demonstrating the names or classes of available persons not called and the reasons for the conclusion that they have superior knowledge of the facts." Clawans, 38 N.J. at 172; State v. Carter, 91 N.J. 86, 128 (1982) ("The same practice should be followed if comments are to be made in summation."). This process allows the opposing party the option of calling the witness or demonstrating to the court the reason for the decision not to do so and the court can then determine whether an adverse inference charge is warranted. Clawans, 38 N.J. at 172.

27

As the trial court correctly found, a <u>Clawans</u> charge was improper here because: (1) defendant's request was made "after both parties [had] rested"; (2) Rodgers's testimony during the Rule 104 hearing "does not offer superior knowledge or superior testimony to anyone else"; and (3) the State's reliance on defense counsel's promise it "was not going to seek a <u>Clawans</u> charge."[15] Our careful review of the record reveals no error.

The absence of a timely request for a <u>Clawans</u>, charge is a sufficient basis to reject defendant's arguments. Defendant was not entitled to either the requested adverse inference charge or to argue about Rodger's absence from trial based on the State's decision not to call him as a witness. We can fairly glean from the record that Rodgers was not "particularly within the control or power" of the State. Defendant was aware of Rodger's identity and could have subpoenaed him as a witness. A witness who is available to both parties but was not called to testify "preclude[s] the raising of an inference against either." <u>Id.</u> at 171.

---

[15] Defense counsel claimed he had not intended to "hid[e] the ball" but the respective conversation with the State had been earlier that day and it had not been defendant's intent to pursue a <u>Clawans</u> charge, at the time, but rather a model jury charge that was "similar to a <u>Clawans</u> charge."

In addition, the record contains no evidence that Rodger's testimony would neither have "elucidate[d] relevant and critical facts in issue" nor would have been "superior" to L.R.'s testimony because he testified at the relevant Rule 104 hearing and did not recall what occurred. See Hill, 199 N.J. at 561-62. Indeed, at the start of the relevant Rule 104 hearing, the State instructed both the trial court and defense counsel "regardless of what [Rodgers] will say in court," it was the State's position "that [L.R.] herself is the credible party." The record shows the State "submitted several memorandums" regarding Rodgers emphasizing the fact that he had been uncooperative. And, defense counsel had the opportunity to cross Rodgers during the Rule 104 hearing, to no better. "And am I correct—or did I correctly understand you that you remember the event of going out clubbing with your buddies, but you don't really remember much, if anything, about that—the details of what took place that night?"

Moreover, Rodgers's testimony during the relevant Rule 104 hearing provided the trial court with a reason the State would not call Rodgers other than "some apprehension about his testimony." Velasquez, 391 N.J. Super. at 306 (quoting Burgess, 440 F.2d at 237). "He[] refus[ed] to answer questions. If [the State] did put him on the stand, [we] would then be in a precarious situation to disclose things that he told my investigators . . . . [a]nd [the State] think[s] that

he's entitled to have those kept private."  We are satisfied the State provided a genuine reason why it would not call Rodgers other than "some apprehension about his testimony."  Ibid. (quoting Burgess, 440 F.2d at 237).

Importantly, defendant concedes "he was late in asking for an adverse inference or mention of such in summation."  Defendant had known since the relevant Rule 104 hearing that the State did not intend to call Rodgers to the stand.  Because defendant has no excuse for his late request for the Clawans charge, we review the record under the plain error standard for an error "clearly capable of producing an unjust result."  State v. Whitaker, 200 N.J. 444, 465 (2009) (quoting R. 2:10-2).  "Not any possibility of an unjust result will suffice as plain error, only 'one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'"  State v. Coclough, 459 N.J. Super. 45, 51 (App. Div. 2019) (quoting State v. Macon, 57 N.J. 325, 336 (1971)).  It is apparent the jury determined the evidence admitted at trial, even without testimony from Rodgers, was sufficient to eliminate reasonable doubt that defendant committed the charged offenses.

V.

Finally, defendant argues the sentencing court's aggregate forty-five-year sentence with thirty-eight years and four months of parole ineligibility was

excessive.[16]  State v. Bolvito, 217 N.J. 221, 228 (2014) (requiring the appellate court to remand a sentencing where "'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'"  (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984))); Torres, 246 N.J. at 272 (noting the appellate court employs "the general shock-the-conscience standard for review of the exercise of . . . consecutive-versus-concurrent sentencing."). Defendant does not contend the sentencing court violated the sentencing guidelines or that the findings of aggravating and mitigating factors, N.J.S.A. 2C:44-1(a)-(b), were not based upon competent credible evidence in the record. Rather, defendant contends: (1) the "Yarbough[17] factors militate against consecutive sentencing"; and (2) "[p]rior criminal history is not an appropriate Yarbough factor."

---

[16] On May 11, 2021, while this appeal was pending, our Court issued its decision in Torres, which addresses the standards for imposing consecutive sentences. See 246 N.J. at 268-73.  The Court held that "essential to a proper Yarbough sentencing assessment" is "[a]n explicit statement, explaining the overall fairness of a sentence imposed on a defendant for multiple offenses in a single proceeding or in multiple sentencing proceedings."  Id. at 268 (citing State v. Yarbough, 100 N.J. 627 (1985)).

[17]  100 N.J. at 643-44, superseded by statute in part, N.J.S.A. 2C:44-5(a), as recognized in State v. Cuff. 239 N.J. 321, 348 n.4 (2019) (noting the statute's elimination of a sixth factor originally set forth in Yarbough, which set an outer limit on the overall cumulation of consecutive sentences).

Our Court directed sentencing judges to consider the following factors:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing [judge] should include facts relating to the crimes, including whether or not:
>
> > (a) the crimes and their objectives were predominantly independent of each other;
> >
> > (b) the crimes involved separate acts of violence or threats of violence;
> >
> > (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
> >
> > (d) any of the crimes involved multiple victims;
> >
> > (e) the convictions for which the sentences are to be imposed are numerous;
>
> (4) there should be no double counting of aggravating factors; [and]
>
> (5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense . . . .
>
> [Torres, 246 N.J. at 264 (quoting Yarbough, 100 N.J. at 643-44).]

"The Yarbough factors are qualitative, not quantitative; applying them involves more than merely counting the factors favoring each alternative outcome." Cuff, 239 N.J. at 348.

Sentencing judges should "be mindful that aggravating and mitigating factors and Yarbough factors, as well as the stated purposes of sentencing in N.J.S.A. 2C:1-2(b), in their totality, inform the sentence's fairness." Torres, 246 N.J. at 272. The judge "must explain [his or her] decision to impose concurrent or consecutive sentences in a given case" because "[a] statement of reasons is a necessary prerequisite for adequate appellate review of sentencing decisions." Cuff, 239 N.J. at 348 (second alteration in original) (quoting State v. Miller, 108 N.J. 112, 122 (1987)).

The court determined that the sentences on counts four and five were to run consecutively and placed its reasons for imposing consecutive terms on the record:

> [T]he reasons, that I gave the consecutive term are, . . . I found that . . . there were three separate and distinct violent acts that occurred on the day in question. Number one, there was a sexual assault where he forced her to perform oral sex on him. Two, a second and . . . separate and distinct offense of aggravated assault where he beat her pretty badly. And then another separate and distinct offense, and that was when he went to take the car and commit the car jacking. That was a separate and distinct offense also.

33

In addition, because of his prior record I felt that . . . was another factor to consider in . . . conjunction with those other . . . reasons for the consecutive sentence.

The sentencing court did not adequately explain its reasons for imposing consecutive sentences and we are constrained to remand for resentencing. While this appeal was pending, our Court issued its opinion in <u>Torres</u>, which addresses the standards for imposing consecutive sentences. <u>See</u> 246 N.J. at 268-73. Here, the court imposed consecutive sentences but erred by considering defendant's prior record as a basis for the imposition of consecutive sentences. The sentencing court also failed to provide a statement addressing the overall fairness of the sentence required by the Court in <u>Torres</u>. In addition, the court found aggravating factors three, the risk that defendant will commit another offense, N.J.S.A. 2C:44-1(a)(3); six, the extent of defendant's prior criminal record and the seriousness of the offenses of which defendant has been convicted, N.J.S.A. 2C:44-1(a)(6); and nine, the need for deterring defendant and others from violating the law, N.J.S.A. 2C:44-1(a)(9). No mitigating factors were found.

A court may not rely on a defendant's prior record when imposing a consecutive sentence. The <u>Yarbough</u> factors specifically include "there should be no double counting of aggravating factors." <u>Torres</u>, 246 N.J. at 264 (quoting

Yarbough, 100 N.J. at 643-44); see also Miller, 108 N.J. at 122 ("[F]actors relied on to sentence a defendant to the maximum term for each offense should not be used again to justify imposing those sentences consecutively.").

In the matter under review, the court erred by relying upon defendant's prior record when imposing consecutive sentences and by double counting aggravating factors three and six. Specifically, the court found:

> [T]he following aggravating factors. Number [three], the risk that . . . defendant will commit another offense. That's clear by his prior record. Number [six], the extent of his prior criminal record and the seriousness of it. Again, I'm noting that he's certainly not been rehabilitated by any way, shape or form. And number [nine], the need to deter . . . defendant and others from violating the law.
>
> [(Emphasis added).]

Therefore, we conclude the sentencing court abused its discretion by imposing consecutive sentences because the sentencing guidelines were violated. See Bolvito, 217 N.J. at 228 (requiring the appellate court to remand a sentence where "the sentencing guidelines were violated" (emphasis added)). As a result, a remand for resentencing is required. We also direct the sentencing court on remand to correct the JOC to reflect that the court imposed consecutive five-year periods of parole supervision following defendant's release under NERA. Nothing in this opinion shall be interpreted as expressing an opinion on

whether consecutive sentences should be imposed on remand. The trial court shall address the issue on remand, make a decision in accordance with the applicable legal standards, and make findings of fact and conclusions of law supporting its decision.

Affirmed in part, reversed in part, and remanded for resentencing in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5466-18